## ATLANTIC REFINING CO. v. HODGMAN et al.

## SUPERIOR OIL CORPORATION v. SAME.

(Circuit Court of Appeals, Third Circuit. July 9, 1926.)

Nos. 3443, 3444.

**1. Corporations ⬨⟿101.**

Defendant, by purchase of corporation stock at less than price paid for same stock by bankers' syndicate underwriting it, *held* not guilty of unfair dealing toward syndicate, which had knowledge thereof and required defendant to tie up its stock for 2 years and to enter into 10-year contract to purchase oil output of corporation.

**2. Corporations ⬨⟿101.**

Stockholders of corporation cannot complain of alleged fraud on third party exchanging property to corporation for stock because of purchase of stock by defendant at lower price; such third party not complaining thereof.

**3. Corporations ⬨⟿99(1).**

Though under Delaware law arbitrary sale of same issue of stock at different prices to different persons will not be sanctioned, such sales will be sustained, if based on business and commercial facts, justifying it in exercise of fair business judgment.

**4. Corporations ⬨⟿99(1).**

Corporation *held* to have acted within its authority in selling stock to creditor at lower price than to others in payment of loan, and in consideration of 10-year contract for sale of oil output, in view of fact that corporation could not increase its stock until loan was paid, and requirement of bankers' syndicate underwriting stock relative to oil contract.

**5. Corporations ⬨⟿99(1).**

Sales of corporate stock at different prices are lawful under Delaware law, if made for adequate business and administrative reasons.

**6. Corporations ⬨⟿101.**

Corporation, agreeing to take corporate stock for debt due from another corporation, was not chargeable with fraud in acquiring stock at lower price than others, because of alleged failure to disclose price under request of president of debtor corporation, in view of circumstances requiring secrecy, and particularly since directors had knowledge of actual price they were to receive.

**7. Corporations ⬨⟿101.**

Corporation *held* not guilty of fraud by contracting to take 10-year oil output of another corporation, in view of fact that such contract was more advantageous to seller than to buyer,

and was made at request of bankers' syndicate underwriting stock of seller corporation.

**8. Corporations ⬨⟿101.**

Corporate director, present on board as representative of creditor corporation, *held* not guilty of fraud in transaction whereby block of corporate stock was acquired by creditor corporation at price much less than that paid by others in view of showing that he abstained from voting on questions complained of.

Appeal from the District Court of the United States for the District of Delaware; Hugh M. Morris, Judge.

Suit by Marshall Hodgman and others against the Atlantic Refining Company and the Superior Oil Corporation. From a decree for plaintiff (300 F. 590), defendants separately appeal. Reversed and remanded, with directions.

See, also, 2 F.(2d) 893, and 8 F.(2d) 777.

No. 3443:

Yale L. Schekter, of Philadelphia, Pa., Robert H. Richards, of Wilmington, Del., Ira Jewell Williams and Francis Shunk Brown, both of Philadelphia, Pa., and Charles Evans Hughes, of New York City (Ira Jewell Williams, Jr., Carlos Berguido, Jr., and Brown & Williams, all of Philadephia, Pa., of counsel), for appellant Atlantic Refining Co.

Lawrence Berenson, of New York City, Andrew C. Gray, of Wilmington, Del., Arthur Berenson, of Boston, Mass., and Herbert H. Ward, of Wilmington, Del. (Ward, Gray & Ward and E. Ennalls Berl, all of Wilmington, Del., of counsel), for appellees Hodgman and others.

No. 3444:

Willard Saulsbury and Charles F. Curley, both of Wilmington, Del. (Saulsbury, Curley & Davis, of Wilmington, Del., of counsel), for appellant.

Herbert H. Ward, Andrew C. Gray, and E. Ennalls Berl, all of Wilmington, Del., for appellees.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge. This bill was brought by individual stockholders of the Superior Oil Corporation, hereafter called Superior, against the Atlantic Refining Company, hereafter called Atlantic, to enforce rights of the former company against the latter. The majority stockholders of Superior and the officers of Superior having declined to seek such relief, the bill was brought by the plaintiff stockholders against Atlantic, and Superior also was made a defendant.

Aligning the parties according to interest, the real plaintiff before us and the party whose rights are to be proven and established is the Superior Oil Corporation and the real right of action here involved is the right, if any, of that company against the Atlantic Company. Viewing the action, then, as that of Superior against Atlantic, what are the rights of Superior against Atlantic, and what are the responsibilities of Atlantic to Superior? If we correctly determine the rights and obligations of these two corporations to each other, we have the foundation on which this case must properly be adjudged.

Superior was a corporation of the state of Delaware, and by virtue of its corporate powers was engaged in the production and sale of petroleum. Atlantic was a corporation of the state of Pennsylvania, and, in addition to producing oil, was engaged in manufacturing illuminating and lubricating oils and other products of petroleum. Contemplating an expansion of its business by buying additional oil properties, Superior, on March 4, 1920, secured from Atlantic a loan of $2,750,000. This was effected by a contract of that date between Superior, Atlantic, and the former's president, Robert M. Catts, designated trustee, "for the sole purpose of carrying out the terms and conditions of this contract duly authorized by the board of directors" of Superior.

Confining ourselves to such provisions of this lengthy document as are here pertinent, we note that Superior was about to acquire from Robert M. Catts, trustee, certain described oil properties in the state of Kentucky, "which properties are all to be acquired from Robert M. Catts, trustee, subject to an indebtedness of $2,750,000 to Company B, which sum represents a loan made by Company B to said trustee to enable him to acquire said properties, which loan, with interest at the rate of 6 per cent. per annum, is to be repaid as hereinafter more specifically set forth, and in no event not later than 1,000 days from date hereof." It was also recited that Atlantic wished to buy the entire oil produce of Superior "from all its present properties and its said properties so about to be acquired during a period of five years, commencing March 4, 1920, and for such longer period as said loan or any part thereof and interest shall remain unpaid."

To carry out these purposes the contract provided that Atlantic should loan to Catts, trustee, to enable him to acquire the scheduled property, "an amount up to $2,750,000, * * * which loan the trustee, or any one assuming said obligation, and Superior hereby agree to repay, with interest, * * * within 1,000 days from date hereof, and at the same time same shall be payable at the rate of not less than one-third of the net daily production from the said combined properties." Provision was also made that, of the 150,000 shares of stock issued by Superior to Catts, trustee, to pay for the newly acquired property, 86,667 shares were to be deposited with Atlantic as collateral. It was agreed a contract should be made for the Atlantic to buy, and Superior to sell, all its oil production of its owned and now acquired property at the current prices of the Seep Purchasing Agency for five years, "and so much longer as any part of said loan with interest, shall remain unpaid," with the understanding that, in paying for such oil, Atlantic could retain and apply to the note the price of one-third the oil, which sum Superior guaranteed should be at least $2,750 daily. And Superior and Catts agreed that another one-third of the oil income was to "be set apart and employed by Superior for maintenance of production, drilling, and betterments, for the purpose of maintaining and increasing the production of said combined properties."

By the contract, Superior had a right to anticipate payment of the entire loan, but, until the loan was paid, Superior could not increase its stock, and "with the express understanding that this is only for the purpose of further protecting said company [Atlantic] in the event that said company [Superior] shall, at any time prior to the repayment of said loan, fail to carry out the terms of this contract," Superior was to keep in Atlantic's hands the resignations of a majority of its directors, and, in case of default, Atlantic was empowered to elect a majority of Superior's directors, "so that all property owned or controlled by Superior shall be operated or liquidated for the repayment of said loan." Provision was further made by Superior and Catts, trustee, that one share of the stock held as collateral by Atlantic should issue to a person named by Atlantic, who should serve as a director "for the purpose of protecting said loan and its repayment, with interest," and also that Catts should serve as a director until the loan was paid.

At the date of this contract the authorized stock of Superior was 300,000 shares. It left the parties occupying the relation of lender and borrower. There is nothing what-

ever in the record to show anything other than the law would presume from such a situation, namely, that both companies acted in good faith and for their own best interests. Tersely stated, the gist of the contract was that Superior was acquiring further oil properties, and was taking them in the name of its president, Catts, as trustee; that Atlantic was advancing the funds to Catts to acquire such properties; that Superior was assuming the debt; that to pay it Superior was setting aside one-third of its production at the prices set by the Seep Agency; that in case of default it was turning over its property and management to Atlantic until its debt was paid; and that, pending the loan, Superior was, for the purpose of Atlantic's protecting its loan, allowing on its board a director nominated by Atlantic, who had no financial interest in Superior. Meanwhile one-third of Superior's income was by contract allocated to the loan, another one-third to specific work heretofore noted, leaving but one-third free for Superior control. But that Superior was, from the start, falling behind in its daily payment of $2,750 required by the contract is evidenced by the settlement memorandum, later made and hereafter referred to, which shows that for the 118-day period from March 4th to July 1st, while the daily production payment guaranteed by the contract was $322,500, the actual production was only sufficient to pay $233,299.74. Moreover, it will be noted that, if this deficit continued, the 5-year production contract would be automatically extended until the loan was finally paid.

With this contract in force, which left Superior with a limited working capital, without power to increase its capital stock or to finance the acquisition of additional properties, Superior found itself in a condition which it outlined in a letter of May 29, 1920, wherein the facts are stated, viz.: (1) That its "early operations were comparatively limited in scope, and it was deemed wise to increase the area of its producing properties"; (2) in view of its "pipe line capacity, which is now materially in excess of present production"; and (3) that it should have "additional working capital provided through sale or exchange of 1,118,478 shares of new stock."

These considerations evidently led to Superior undertaking, through Catts, its president, negotiations with four prominent banking firms which it endeavored to enlist in its refinancing plan. Its letter to them, dated

May 29, 1920, and accompanied with a proposed prospectus to the public, marked "confidential," dated June 5, 1920, in substance provided: That Superior increase its shares from 300,000 to 2,500,000, of which 1,018,-478 shares will be presently issued for the purpose of acquiring the additional production and for working capital. At the conclusion of this operation there will be outstanding 1,231,811 shares, and there will be in the treasury of the corporation 1,268,-189 additional shares. The plan also contemplated the Atlantic purchasing a substantial block of the stock for its own investment; the Atlantic purchasing for 10 years the entire output of Superior; the Atlantic undertaking the management of Superior for 3 years, by selecting a majority of the board of directors, and the offer to the syndicate of the stock at $19 per share.

While this plan of Superior was never carried through, yet, evidently with a view to its being carried through as outlined, a conditional contract, dated June 24, 1920, covering Superior's production for 10 years, by Atlantic, was entered into. We say "conditional contract," for it will be seen that the substitution of this contemplated 10-year contract for the 5-year one in force was, as the contract stated, conditioned that "it is agreed that said existing contracts between the parties remain in full force and effect until said buyer's loan to seller and interest shall be paid in full, and that this agreement shall not become operative and effective until said loan has been paid, all as aforesaid." In effect, this contract provided that, if Superior paid off its debt to Atlantic, then Atlantic's contract to take Superior's product for 10 years then, and then only, came into effect. This provisional contract, it will be noted, fixed prices according to the Seep Agency provision of the former contract, and in that connection it will be observed that both contracts had the same equitable provision, namely, that in case the agency posted no price for Somerset oil, the price should be fixed by three arbitrators, "one a refiner selected by Atlantic, one a producer selected by Superior, and the third to be selected by these two."

That it and other provisions were desired by Superior as a means of inducing the bankers to underwrite Superior's new issue of stock is shown by the testimony hereafter referred to. Indeed, it is clear that, to enable Superior to finance its plan and thus acquire the additional oil property needed to pay off its daily loan requirement and ob-

tain new capital, four things were necessary: (1) To induce Atlantic to exchange its indebtedness for stock; (2) to tie up its stock so acquired for two years; (3) to take Superior's entire product for 10 years instead of 5; and (4) to assume the management of Superior's properties. That these were the bankers' requirements during the negotiations between them and Superior is shown by the testimony of Francis M. Weld, their syndicate manager, who was called as a witness by the plaintiff, viz.:

"We also felt that it was of considerable importance to have the Atlantic stock tied up as it was for two years, so it could not come out on the market. In other words, they were getting only receipts; they were not getting actual stock. Naturally, we were very much influenced by the fact that the Atlantic Refining Company were to be the management of the Superior Oil Corporation; and we considered it important that this oil contract should be extended and kept in force for, I think it was, 10 years, because it meant a steady, sure market for the oil that was produced by the Superior Oil Corporation. It would keep them from having to shut down in bad times.

"XQ. Will you tell the court whether or not the bankers would have purchased the stock of the Superior Oil Corporation had it not been for the assumption and management by the Atlantic Refining Company and the 10-year oil contract that you have referred to? A. No; I do not think that they would have."

And, further, it will be noted, when this contract for 10 years' oil production was being considered by Superior at the directors' meeting of June 24, 1920, the minutes show that Director Henry, who, as we have seen, was the representative of Atlantic on Superior's board to safeguard its loan, stated that his company, "provided that so to do in any instance would not work to its own disadvantage, would at any time be glad to waive its right so to purchase under the terms of the contract, if the Superior Company deemed it advantageous to sell that oil elsewhere."

Whatever may have been the conduct of Catts, the president of Superior, during these negotiations, whatever the representations he made, no contract between Atlantic and Superior other than the 10-year oil provisional contract based on the bankers' requirement, had resulted therefrom when, on August 5, 1920, the corporate written contract between Atlantic and Superior here involved

was made. On that day, as shown by Superior's minutes, a letter of Atlantic to Superior was presented at the directors' meeting, as follows:

"New York, August 5, 1920.

"Superior Oil Corporation, 32 Nassau Street, New York City—Gentlemen: The undersigned company, under agreements with your company, to which we refer, has loaned and advanced moneys for the purchase of properties by your corporation and the charges and expenses incident thereto incurred by your corporation and ourselves. We are informed that Messrs. Brown Brothers, White, Weld & Co., Graham, Parsons & Co., and Frazier & Co., propose to loan your corporation the sum of $2,910,000, and to accept in payment thereof, under certain contingencies, 181,875 shares of stock of the Superior Oil Corporation.

"We hereby offer to accept 325,000 shares of the stock of your corporation, issued full-paid and nonassessable in full payment of the principal sum of all your indebtedness to us, including charges and expenses, and for interest accruing on said principal sum from June 1, 1920 (all evidence of such indebtedness to be canceled by us and surrendered to your corporation). Our acceptance is conditional upon your delivery to the aforementioned firms of 181,875 shares of your stock in payment of their loan to you, and furthermore conditional upon the aforementioned firms' purchase from your corporation 81,500 shares at $16 per share. Subject to the approval of your board of directors, we will accept from R. M. Catts, trustee, 86,666 shares of your capital stock now held by us as part payment of the 325,000 shares we offer to accept, leaving certificates for 238,334 shares of your stock to be delivered to us. We suggest that such delivery, coincident with delivery of 181,875 shares plus said 81,500 shares to bankers be made at the office of the Guaranty Trust Company in the city of New York on or before August 19, 1920.

"This offer is made subject to the resolution of your board of directors of June 24, 1920, and without in any way affecting our contract of June 24, 1920, with your corporation for the purchase of crude petroleum for the period of ten years.

"The Atlantic Refining Company,
"By [signed] W. M. Irish, Vice President."

"Thereupon, on motion duly made and seconded, it was unanimously resolved, that the board of directors hereby accept the of-

fer of the Atlantic Refining Company dated August 5, 1920, upon the terms thereof; and

"Further resolved, that the proper officers of this company be and they hereby are authorized and directed to deliver to the Atlantic Refining Company, or their nominee, in full payment of all indebtedness of this company to the Atlantic Refining Company (as per schedule to be agreed upon between the officers of this company and the Atlantic Refining Company, setting forth in detail the items of such indebtedness) 325,-000 shares of the common stock of this company, delivery to be made by assignment to the Atlantic Refining Company by Robert M. Catts, trustee, of a certificate or certificates for 86,666 shares standing in the name of Robert M. Catts, trustee, and indorsed in blank, and a certificate or certificates for 238,334 shares standing in the name of the Atlantic Refining Company, or its nominee; and

"Further resolved, that the proper officers of this company be and they hereby are authorized and directed to execute and deliver to the Atlantic Refining Company, or its nominee, in pursuance of the preceding resolution, and the transfer agents and registrars to countersign and register, respectively, stock certificates in the forms to be approved at this meeting for 238,334 shares of the common stock of this company."

In pursuance of this resolution an account was stated which showed Superior was entitled to credits on its indebtedness of $295,787.78. This sum, deducted from its indebtedness to Atlantic, which Atlantic paid to Superior by check dated September 1, 1920, left Superior's indebtedness to Atlantic $2,750,000, which made the cost to Atlantic of the 325,000 shares of stock about $8.54 per share. Inasmuch as this contract obtained for Superior from Atlantic additional funds, and enabled it to pay off its debt to Atlantic, and thereby make the conditional 10-year contract an absolute one, it follows that the two contracts, one for the sale of the stock and the other for the sale of oil production, were so interrelated and indeed fused into one indivisible contract whole that a court of equity could not, in justice, hold the parties to one without holding them to both, nor annul one without annulling both.

Noting the happenings of events following the carrying out of the provisions of the contract, which was done the same month, it appears that very shortly trouble arose in the newly constituted management, which, on November 20, 1920, resulted in Catts, the

president of Superior, writing a letter to the executive committee of the latter, objecting to a continuation of what he termed dual management, namely, the executive committee and himself. Thereupon the Atlantic Company, which was advised of such situation, notified Superior of its willingness to rescind the new contract, the 10-year oil contract, surrender its stock, and restore the status of debtor and creditor as they had existed. This offer, which was not accepted by Superior, was embodied in a letter which read as follows:

"We shall pass all reference to the conversion of our loan to the Superior into stock of that company, as referred to on the seventh and eighth pages of Mr. Catts' letter, with the simple statement that the conversion was most vigorously urged by Mr. Catts, and that the Atlantic deferred decision a very long time to dispose of numerous grave doubts which arose as to the propriety of the conversion. In fact, when the step was taken, there was still some doubt in the minds of some of us, and the overbearing element of our decision was our desire to assure for our refineries for a long period of time the appreciable and staple quantity of crude oil which Mr. Catts so specifically promised. This is probably as good an occasion as any to in all sincerity say that we are willing, and under the circumstances anxious, to be restored to our former position, whereby we would surrender our stock to the corporation, would be relieved from its management, would reinstate our advance to the Superior under the loan agreement of March 4, 1920, as amended March 9, 1920, cancel the 10-year crude oil contract of June 24, 1920, and reinstate the 5-year contract of March 10, 1920, and we hereby present this proposition for serious consideration by the executive committee and the board of directors of the Superior Oil Corporation, for action at any time prior to the next annual meeting."

The proofs show that oil was then selling between $4.25 and $4.50 per barrel, and the stock of Superior was selling at from $11 to $12 per share. On February 18, 1921, certain stockholders of Superior notified that company that this acquisition of stock of Superior by Atlantic at $8 per share, when the company was realizing $16 from others, was "unlawful and invalid, that a great injustice was done to the Superior Oil Corporation, and that a large loss was suffered by it. It is the imperative duty of the directors and officers of the Superior Company to see

13 F.(2d)—50

that this injustice is righted, that the transaction is rescinded, and that the resultant loss to the Superior Oil Corporation shall be recovered, and toward that end I demand of the officers and directors of the Superior Oil Corporation that proper actions be promptly instituted by them in the courts to right this injustice and to recover the large losses to the Superior Oil Corporation." The notice also alleged that the 10-year oil comtract was unlawful, in that it was procured by Atlantic when a majority of Superior's directors were agents of Atlantic, and when Superior's board of directors were dominated by Atlantic. On Superior's failing to bring suit, the present action was brought by such shareholders in behalf of Superior.

A vast amount of testimony was taken, but in the final analysis the trial court held the case narrowed to two questions, which it thus stated: "The vices of the transaction, as plaintiffs assert, are actual fraud in its accomplishment and legal inability of the Superior to issue the stock for one-half of its value." Addressing itself to those questions, the trial court found both questions against the Atlantic, holding in effect that Superior had no legal power to sell the stock in question at $8 per share and that Atlantic, in paying $8 a share for such stock, perpetrated a fraud on Superior. After a full argument of the case and due consideration, we are of opinion the court, in so doing, fell into error, and that it should have dismissed the bill.

Turning our attention first to the legal question as stated by the court below, namely, the asserted "legal inability of the Superior to issue stock for one-half its value," we note that this does not represent the real question. The question is not one of the power of a Delaware corporation to issue stock, but one of such corporation's power to sell stock. No attempt is here made to cancel or annul the stock issue as such. Indeed, it is here asserted that part of the issue properly passed into the hands of others; that Superior's sale of such other stock created a criterion of lawful value, and is the test of the legality of a sale made of the same issue to the Atlantic Company, which stock Superior, as noted above, declined to receive back when Atlantic tendered its return, and which the court, by its decree, compels Atlantic to hold. It will thus be seen that the question before us is not one of stock issue, but of stock sale. Turning to the proofs, was there such a difference in price between Atlantic buying at $8 when the bankers'

syndicate paid $16, as made the Atlantic's purchase a fraud on Superior?

Now, if fraud were committed by the Atlantic, it is clear that the parties wronged were, first, the bankers' syndicate, who paid $16 a share for the same stock for which Atlantic was paying $8 a share; second, the Old Dominion Company, which was selling its property on the basis of $16 a share when the Atlantic was buying the same stock at $8 per share; third, stockholders in the company, who were, to the extent of their proportionate holdings, defrauded by the Superior only obtaining $8 per share on its Atlantic stock, when it should have received $16. Now, what are the proofs and the facts in that regard? There is no doubt that Catts, Superior's president, who, it seems, was the only person representing Superior, both in its proposed sales to the Atlantic and in its dealings with the bankers' syndicate, did request Irish, the vice president of Atlantic, to keep secret the $8 price he was making for them, and that Irish complied with Catts' request, and that the bankers' syndicate at first supposed the Atlantic was paying the same price they were paying. But, before the contract of sale of August, noted above, was made, the testimony is explicit that the bankers' syndicate knew the Atlantic was paying only $8. This is made clear by the testimony of F. M. Weld, the manager of the bankers' syndicate, as follows:

"XQ. Mr. Weld, at one stage of the transaction, you appear, by the letters that have been offered here by Mr. Berenson and produced on call by you, to have misinterpreted the position of the Atlantic Refining Company, and, to the extent which you did, will you testify whether or not the Atlantic Refining Company undertook to correct any misapprehension you may have had with respect to its part in the purchase of stock of the Superior? A. Mr. Catts corrected our misunderstandings. * * *

"XQ. Did you at any time, Mr. Weld, represent to anybody that the Atlantic Refining Company had agreed to pay $16 a share for each share of stock of the Superior Oil Corporation to be acquired by it? A. We may have, at the very beginning of our negotiations with Mr. Catts, before we were corrected in our misunderstanding. * * *

"RDQ. So that you knew that the debt was to be canceled and the stock, 325,000 shares of stock, was to be taken over by the Atlantic Refining Company, some time prior to August 5, 1920; is that the way you want

to leave it? A. Yes, that is what I told you."

In that connection it will be noted that the bankers' syndicate have not, and do not, now complain or join in the present bill, but, on the contrary, four of the bankers' syndicate, to wit, S. C. Brown, of Brown Bros. & Co., Howard S. Graham, of Graham, Parsons & Co., Howard F. Hansell, Jr., of Frazier & Co., and F. M. Weld, of White, Weld & Co., who were members of the board of directors of Superior, and on March 10, 1921, attended a regular meeting of the board of directors of Superior, when the matter of the present bill was brought up, and these four directors each voted and joined with all the other directors present in a resolution which stated the bill was "a false, malicious, and unwarranted attack upon the Atlantic Refining Company and the Superior Oil Corporation, and without foundation in law or in equity," and authorized counsel to take "action in court against said suit," and to take such action as was deemed essential "for the protection of the corporation against such action."

Moreover, the proofs show that the two provisions of the contract, to wit, the 10-year oil contract and directorate control of Superior by Atlantic, which are now alleged to constitute fraud and corporate domination on the part of Atlantic, were matters insisted on by the bankers' syndicate, and without which they would not underwrite the new issue and finance the company. In that regard the testimony of Weld, the bankers' syndicate manager, quoted above, is that there were three requirements on the part of the bankers' syndicate.

[1] Moreover, it will be noted that the bankers' syndicate requirement that the stock acquired by Atlantic should be tied up for two years was of the highest importance to the syndicate, in enabling them to sell the $16 underwritten stock at a profit of $3 per share to themselves. This was pointedly called to the attention of Superior's directors on August 5th, when the contract was concluded; it being stated in the minutes that "the president stated that the carrying out of the proposed deposit agreement would be of material benefit to the company, in that the withholding of the stock so deposited from the market would enable the company to obtain a higher value for its stock in the event of the acquisition of future properties in exchange for stock." Indeed, had they not tied up Atlantic's $8 stock, Atlantic, as any one familiar with underwriting will realize,

could have demoralized the market the bankers were creating for Superior's stock. The bankers very properly insisted on this tie-up of Atlantic's stock for their own protection. Second, it goes without saying that what benefited the bankers benefited Superior, and that unless that concession had been made the underwriting would not have been undertaken. The advantage of the underwriting was that thereby Superior was able to obtain from the underwriters $16 per share for such stock. Third. The two-year tie-up of the stock by the Atlantic was not only a substantial concession on its part, because it deprived that company of the exercise of all powers of ownership of its stock for two years, but the outcome of it was disastrous, for at the end of that time the tied-up stock of 325,000 shares had fallen to $6.12 per share, so that, apart from all other considerations given, the stock for which Atlantic paid in money $2,750,000 had a market value of $1,990,625, a loss of $759,375, due to the two-year tie-up requirement of the bankers. Summing up, then, the relation of the bankers to the contract here involved, the proofs show that the Atlantic was not guilty of any unfair dealing toward them, and that their very proper insistence on their requirement has resulted in very substantial loss by Atlantic.

[2] We turn next to the charge of alleged fraud on the Old Dominion Company, of which it suffices to say that Old Dominion makes no complaint. Old Dominion had no dealings with, or relations to, Atlantic. Old Dominion's only relation was with Superior, and such relation was that of buyer and seller. As seller of its property, Old Dominion set its own price on such property; as seller of its own stock, Superior fixed its own price. On that basis, the minds of the two companies met, and from the fact that Old Dominion has not complained, has not joined in this bill or voted its stock to rescind, its silence would indicate its standing by the transaction as carried out.

We turn next to the alleged wrong done to the stockholders of Superior. The outstanding stock of Superior was over 900,000 shares. What is their attitude towards this alleged fraud? The holders of some 10,000 shares of the stock bring this bill, alleging fraud in this contract, while, leaving entirely out the 325,000 shares owned by Atlantic, which took no part in such action, the holders of 137,161 shares of the stock, in person or by proxy, attended a stockholders' meeting held on March 28, 1922, and voted unani-

mously in approval of the action of Superior in declining the offer of Atlantic of December 20, 1920, to return the stock purchased by Atlantic, to rescind the 10-year production contract, and restore the pre-August, 1920, status.

Deferring, for a later consideration, the alleged misrepresentations, fraudulent concealments, and other acts which are said to have brought about this contract, and confining ourselves to the contract as a contract to sell stock of the same issue to different persons at different prices, we address ourselves to the charge of the bill, viz.: "Your orators are informed and believe, and therefore allege, that the transaction by which the refining company acquired said 325,000 shares of the capital stock of the Superior was in violation of the statutes of Delaware in such case made and provided, and it was therefore illegal and ultra vires."

[3] Since the decree was entered below, the case of Bodell v. General Gas & Electric Corporation, 132 A. 442, in which the Court of Chancery of Delaware considered the action of a Delaware corporation in selling stock of the same issue at different prices to different persons, has been decided. It is therefore due to the court below to say that this court has the benefit of an enlightening and authoritative pronouncement which the lower court did not have. Without quoting at length from the exhaustive opinion there delivered, we confine ourselves to such references as particularly apply to our case. To our mind, the basic principle of that case, which permits such different stock prices to different persons, is summed up by the chancery court in these words:

"The mere showing of the two prices would, without satisfactory explanation, undoubtedly entitle the complainants to relief. But, if these two prices are justified by a showing of fairness in the light of all the circumstances, so that what appears to be an injury turns out to be a benefit to those complaining, there can be no ground for interference. If the directors, in the course they are pursuing, are acting in the genuine and beneficial interest of the corporation, and are thereby promoting the interests of all stockholders in a very tangible way, and especially the interests of the class of stockholders who are complaining, why should not the general principles applicable to persons standing in trust relationships come to their supporting aid?"

In that case, as in this, there was the element of the requirement of bankers market-ing the stock and also the sale of some stock to certain persons at $25, which factors enabled the bankers to market the residue of the stock at $45. Of this situation, the chancery court says:

"This policy, it is claimed, made the sale of the additional stock an easy matter, for, in addition to the regular dividend of $1.50 a year which the stock was paying, the announced policy held out to purchasers the prospect, just referred to, of making a profit on the stock they might take at $25 for their regular dividends. Thus, to use an old expression, the stock lifted itself by its own boot straps. If the value of $45 per share is thus created by the combined action of the announced policy and the creation of market prices by the sustaining operations of the bankers on the exchange, it is manifest that $45, the price which was concurrently obtained by the corporation when it was announced that class A dividends would be allowed to buy it at $25 per share, does not represent a sales price which the directors can in fairness be held to. It would be highly unreasonable to point to sales at $45 as showing the inadequacy of sales at $25, if the latter was what in fact made the former possible."

It will thus be seen that, while an arbitrary sale of the same issue of stock at different prices to different persons would not be sanctioned, such differential sales will be sustained, if based on business and commercial facts which, in the exercise of fair business judgment, lead directors to follow such a course.

[4] Under the proofs in this case, we think the situation was one that necessarily gave the directors of Superior a zone of discretion as to this proposed issue of stock. Superior was in debt, and its oil production was not sufficient to make the stipulated payments on its debt to Atlantic, and consequently Atlantic had the right, in case of default, at the dates stipulated in the contract, to take possession of its property and manage it until its debt was paid. Superior felt the need of buying more oil property to increase its production and to increase its working capital. Nor could Superior increase its stock to accomplish these objects, for the contract provided "that, so long as any part of said loan of $2,750,000 and interest remains unpaid, the capital stock of Superior shall not be increased." The only way it could pay off its creditor was to induce Atlantic to convert its debt into stock. On the other hand, the bankers who would underwrite the stock

would not do so unless Atlantic did three things: First, undertake the management of Superior; second, agree to take for 10 years, at market prices, Superior's entire present and to be acquired oil production; and, third, tie up the bought Superior stock for two years. Under such circumstances, and in view of the fact that the bankers would not underwrite the issue unless these conditions were complied with, it is clear that the sale of stock to Atlantic at $8 secured for Superior the $16 from the bankers, and that the making of such sales at different prices was within the field of business discretion vested in the board of Superior's directors, under the quoted decisions of the Court of Chancery, provided, of course, they acted in good faith.

This brings us to the basic question of the case: Whether Atlantic perpetrated a fraud on Superior in the purchase of the stock, or, as stated by the court: "The question of fraud turns upon whether or not proper disclosures were made to the Superior with respect to what the refining company was to pay for the 325,000 shares acquired by it, or whether the Superior and the Old Dominion, which accepted 150,000 shares in part payment for its property, were deceived by false statements, and led to believe that the refining company was to pay and was paying $16 per share therefor."

In taking up that question, we note certain basic facts, among which are: First, that in carrying out its plan of financing, through stock increase, Superior acted wholly and solely through Robert M. Catts, its president; that whatever may have been the derelictions of Catts, and however he may have abused his trust by gaining a personal profit to himself in the sale of property to Superior or otherwise, during this financing, his acts were in no way connected with, participated in, or even known to, Atlantic; second, that Catts was not called by either side as a witness, and the court is without the benefit and light of the inner story of this financing which Catts carried out for his company, nor of his dealings for Superior with the bankers' syndicate, nor his account of his dealing with Atlantic; third, that the proof that, subsequent to the financing, Catts disagreed with, and was hostile to, Atlantic in its management of Superior's affairs, explains why Atlantic would naturally not call him as a witness; and, lastly, the failure of the plaintiffs to call Catts, who was presumably hostile to Atlantic, is not explained.

Turning, then, to the question of fraud

on the part of Atlantic, we address ourselves to the elements of fraud assembled in the court's opinion. We here note that, if the June plans for this financing, which miscarried and were never carried out, had in fact never been proposed, and if the only plan proposed had been the August plan, which went through, there would have been nothing to litigate, and this case would not have been brought. As we read that opinion, the several elements of alleged fraud recited therein group themselves under these heads: First, that the acquisition of stock by Atlantic at $8 per share, when the bankers were paying $16, was a violation of the law of Delaware; second, that when the third, or August, contract was made, Catts and Atlantic had a secret agreement, which was not disclosed to Superior; third, that in making the second, or 10-year oil production contract, Catts was unfaithful to Superior, with the knowledge of Atlantic; fourth, the conduct of E. J. Henry, an officer of Atlantic, who was a director on Superior's board; fifth, by the third, or August, contract, Atlantic fraudulently secured a contract for Superior's production for 10 years; sixth, Catts was wrongfully receiving 45,000 shares for his services; seventh, that proper disclosures were not made by Atlantic to Superior that Atlantic was buying its shares at $8.

[5, 6] Taking up seriatim these alleged elements of fraud, we are clear that the issue or sale of this $8 stock by Superior was legal under the Delaware law. The stock was no-par stock; it was not a sale or issue under par, for example, not the case of a sale at $8 for a stock of a greater par value; and under Delaware corporate law $8 was a legal basis which justified its issue. This sale at $8 being justified, the further question arises: Was the $8 stock illegal, because stock of the same issue was, by the same general transaction, sold at the same time to others at $16? As we have seen elsewhere, sales made at different prices are lawful under Delaware law, if made by the company for fair and adequate business and administrative reasons. Such being the fact in this case, the first alleged ground of fraud fails, unless Superior was deceived and misled into the belief that, by its contract of August, Atlantic was paying $16 a share for its stock; in other words, that, instead of being paid by Atlantic $2,750,000 for its stock, it was being paid $5,500,000.

This brings us to the alleged ground of fraud that, when the third, or August, con-

tract was made between Superior and Atlantic, Catts and Atlantic had a secret agreement, which was not disclosed to Superior. Addressing ourselves to that question, it appears that, when Catts first brought to the attention of Irish, the vice president of Atlantic, the suggestion of Atlantic changing Superior's debt, $2,750,000, into Superior stock on the basis of $8 per share, he requested Irish not to tell what price he was paying. We see no evidence of fraud in Catts simply making such request and in Irish complying with it. Both men were acting as sole representatives of their respective companies, and were both administrative officers of high rank. Irish had no reason to doubt Catts' integrity, or his loyalty to his company, and he had substantial grounds for accrediting him in every respect. Superior had already, in a wholly different transaction, constituted Catts its trustee to acquire extensive and valuable oil properties; Irish's company had advanced to Catts, as the trustee and representative of Superior, $2,750,000; Catts had bought the properties; Superior had recognized the integrity of Catts by taking over the properties, issuing stock to him in payment, and assuming as its own the loan of $2,750,000, which Catts had made from Atlantic, and had, as security for such loan, provided for a 5-year sale of its production at stipulated prices, and all these acts of Catts had been embodied in a contract between the parties, dated March 4, 1920, a contract which has never been questioned or assailed.

It is quite clear, then, that when later Catts came again to Irish with another plan, one providing for Superior increasing its stock and a bankers' syndicate underwriting part of the stock increase, and Atlantic changing its loan into stock, that Irish had every reason to trust, and none to distrust, Catts. He might well assume that the man who had theretofore been intrusted with, and successfully accomplished, the securing of the Atlantic loan of $2,750,000 and its expenditures, would be called on to carry out Superior's new plan of getting Atlantic to exchange that loan for Superior stock. Irish was presumed to know the law of Delaware, that Superior's stock could properly and legally be sold at $8, and that under the law of Delaware such stock could be issued at different prices to different persons. Under those circumstances, and while Catts' efforts were being made, we see nothing sinister or fraudulent in the president and vice president of these companies keeping their own counsel, and of each assuming that each of them was acting with the knowledge and acquiescence of their respective companies. Subsequent events may indicate that Catts may have had some fraudulent purpose of further personal gain at the expense of his company in carrying out the financing; but, if he had, there is no proof that Irish knew of such purpose, or that there was anything to put him on notice of Catts' disloyalty to Superior. That in these intricate and involved operations Catts, during the negotiations, did not tell the bankers' syndicate what price Atlantic was paying for its stock, or that he even led them to believe Atlantic was paying $16, may, for present purposes, be assumed; but there is no proof that Irish, or his company, knew that such was the case, or were in any way a party to what Catts did, and, if such deception was practiced on the bankers, it was the act of Superior's president and sole representative, and not that of Atlantic.

But, without imputing bad faith to any one, we can well understand that, in carrying through a financing plan which, by its own record declaration, as heretofore noted, Superior desired in order to acquire larger fields of production and also working capital for oil development, Catts had a delicate problem before him, which involved several distinct angles, viz. to pay off Atlantic's debt, which was an absolute bar to Superior's issue of stock; to induce Atlantic to convert its debt, with assured interest payments and the safe position of a creditor, into the hazard of a stockholder with uncertain dividends; to make the new issue of stock one that would sell to the bankers and one the bankers could market. It was a situation where there were proposed buyers with different objects in view, and where each buyer would act from his own standpoint, and not from the others, and where Catts, who was dealing with three separate parties, to wit, Atlantic, bankers, and Old Dominion, might well keep his negotiations with each wholly within his own, or their, knowledge; for, to instance the latter alone, it might well be that Old Dominion might well refuse to base its sale on a $16 price for the stock it took for its exchange of property, when Atlantic was basing its exchange of debt for stock on an $8 basis, and this, too, although it was advised that the different prices were lawful under Delaware law.

But, in justice to Irish, it should here be noted that, while Irish complied with Catts' request as to not revealing the $8 price, he

did, when asked by the bankers as to the price, state that his company was not paying $16, viz.: "I had started to say, in answer to the last question, that the price the Atlantic Refining Company was to pay for its stock was raised specifically. My recollection is that the question was put to me by Mr. Weld, and that I replied to him that, inasmuch as Mr. Catts had requested a meeting, our negotiations be with him. I was not at liberty to state specifically the consideration that the Atlantic Refining Company would give for their stock, but that, inasmuch as the figure of $16 a share had been mentioned, I would say that the Atlantic Refining Company would not pay $16." And, as we have said, whatever may have been Catts' conduct, motive, or success in leading the bankers, in the earlier negotiations, to believe that Atlantic was paying $16 for its stock, it is unquestioned that, when the final contract was made on August 5th, they then knew the $8 price Atlantic was paying. In that regard note the testimony of Weld, the manager of the bankers' syndicate, as quoted above.

Indeed, that both bankers and Catts felt it wise not to mention the price Atlantic paid for its stock is indicated by the fact that, in the prospectus of June 5, 1920, which Catts proposed to the bankers for issue to the public, and also in that of August 9, 1920, which the bankers issued, while the price of sale was fixed at $19, and the statement made that Atlantic had "purchased a substantial block of these shares for its own investment," no statement was made to the public of the price paid. It would therefore seem that, if Irish and Atlantic are to be adjudged guilty of fraud for not disclosing to the bankers the price of $8 they were paying for their stock, the bankers were equally guilty of fraud in failing to inform the public in this prospectus that Atlantic had paid but $8 for the stock the prospectus stated that company had bought—an inference of fraud wholly unwarranted.

As we have seen, the transaction was finally consummated by the written offer of Atlantic and the written acceptance of Superior, at the meeting of Superior's directors held August 5th. At this meeting there were present Messrs. Evalenko, Catts, West, Fisk, and Davis, who had been members of the board and were present at the directors' meeting of March 4th, when the loan of $2,750,000, made by Atlantic to Catts, had been taken over by Superior—when Superior's and Atlantic's relations were solely those

of debtor and creditor. Four of them, Evalenko, Catts, Fisk, and Davis, were present at the meeting of June 24th, when the provisional 10-year oil production contract was made, which, as we have seen, came into force when, and only when, Atlantic's loan was paid. Four of them, Evalenko, West, Fisk, and Davis, were present at a meeting held July 14, where the four, together with Schleter, another director, as the minutes show, "in the absence of Mr. Catts and Mr. Henry, who were in attendance upon a meeting of the bankers, where a general discussion of the existing situation was indulged in for half an hour." An examination of the minutes shows the presence of Evalenko, Fisk, and Davis at the directors' meetings of May 24, June 7, June 24, and July 14, while West was present at all these except March 9 and June 24.

Moreover, the Superior board declared two dividends, one May 13, 1920, the other August 5, 1920, and it may be assumed that, before the board declared these dividends, it knew the assets and liabilities of the company. Superior's balance sheet, under date of July 1, 1920, showed "bills payable" in the sum of $2,516,700.26, "to be paid out of oil production in 1,000 days from March 4, 1920," manifestly its debt to Atlantic, as reduced by daily payments. It is quite clear that they knew of the $2,750,000 loan from Atlantic, and the absence from the minutes of any further loans or advances made, or to be made, by that company during April, May, June, and July, must, in the nature of things, have made them cognizant of the fact that Superior's indebtedness to Atlantic was the $2,750,000 which they had taken part in securing. When, therefore, Atlantic's offer was made, which recited, "The undersigned company, under agreements with your company, *to which we refer,* has loaned and advanced money for the purchase of properties by your corporation and the charges and expenses *incident thereto* incurred by your corporation and ourselves," it is clear that this specific reference to agreements under which loans were made and moneys advanced for the specific purpose of Superior buying properties, aptly described the $2,750,000 advanced and secured, and could have referred to no other indebtedness. And then Atlantic's offer was "to accept 325,000 shares of the stock of your corporation, issued full-paid and nonassessable, in full payment of the principal sum of all your indebtedness to us, including charges and expenses, and for interest accruing on said indebtedness from

June 1, 1920 (all evidence of such indebtedness to be canceled by us and surrendered to your corporation)," it is equally clear that the price of such stock was fixed by the $2,750,000 debt. In view of the fact that there had been minor expenses, and that there were credits for oil to be adjusted, and that payments had been made on account, these were facts that, in themselves, prevented an immediate determination of the price this would net on the stock; but all of these factors were ascertainable from Superior's books, and the statement subsequently\prepared by Suender, the treasurer of Superior, under the prior unchallenged management, and a member of its board, and on which settlement was made, shows that Atlantic had no other loan than the $2,750,000 to Superior. On that basis, 325,000 shares for $2,750,000 made the price to Atlantic about $8.54.

In view of these actual facts, as shown to exist, it is now contended that the directors of Superior believed, and had been led to believe, that the indebtedness of their company was of such size that, in this trade of debt for stock, the price Atlantic was to pay was $16 per share. Reduced to figures, this means 325,000 shares at $16 per share was $5,200,000, and the Superior directors supposed the indebtedness of their company to Atlantic was $2,450,000 more than it actually was. No ground is shown to make possible such a situation; they had attended the meetings in the preceding three months; they knew that in the loan-securing agreement of March 4, 1920, in the entering into of which they had taken part, it was stipulated that Superior could not "mortgage or create any lien on, or otherwise incumber, any of its said oil and gas properties"; they knew that at the intervening meetings no action to increase their indebtedness had been taken; and they knew that the whole financing Superior had intrusted to Catts had, as one of its objects, the obtaining of working capital.

In view of these facts and of such knowledge on the part of Superior's directors, the contention now made that they supposed the indebtedness of their company to Atlantic was $2,450,000 more than it was; that they were resting under the impression that this indebtedness had been increased in three months by $2,450,000, and had swollen to over $5,000,000, and without any action by the board of directors, is such a draft on credulity that it may be dismissed without a discussion of other proofs, documents, and minutes tending to strengthen our conclusion; for, if we were to believe that these directors were so helplessly ignorant of the affairs of their company as this contention would assume, we might well feel the bankers' syndicate were wiser than they knew in making one of their underwriting requirements that Atlantic should undertake management of Superior's affairs. Moreover, as bearing on the question of Superior being indebted to Atlantic by some $2,750,000 in excess of its $2,750,000 loan, it will be noted that it was not until June 19, 1920, that Superior had drawn upon Atlantic for, and exhausted, the said $2,750,000 loan, for on that day the several drafts made thereon by Superior during March, April, May, and June ended in the draft of $180,802.60, which totaled the advances to said $2,750,000, which was in accordance with the agreement of March 4, 1920, which provided for the loan by Atlantic of "an amount up to $2,750,000, of which amount $1,500,000 shall be available on or before March 15, 1920, and the balance as required thereafter," an agreement made by these supposedly deceived directors.

We pass, now, to the third alleged ground of fraud, namely, that in making the second, or 10-year oil production, contract, Catts was unfaithful to Superior with the knowledge of Atlantic. Such contention, to our mind, is based on false assumptions. It assumes that Catts was the creator of this contract; it assumes Atlantic was responsible for Catts' acts; it assumes that the contract overreached Superior; it assumes that Atlantic fraudulently procured it. The good faith and business discretion of two companies making such a contract is to be judged from the standpoint of experienced oil men—Superior a producer; Atlantic a refiner. In the first place, the bankers who were to float this proposed stock issue of Superior required Superior to obtain such a contract from Atlantic, and the proof, as quoted above, is that unless it, together with other requirements of the bankers, had been complied with, they would not have underwritten the issue. And not only was this a requirement of the bankers, as set forth in testimony already quoted, but to any one at all familiar with the oil business the contract was so evidently desirable for the oil producer to have, and so undesirable for the refiner to be burdened with, that the statement made by the Atlantic's representative, as recorded in Superior's directors' minutes of June 24, evidences the actual situation, viz.: "Mr. Henry presented and read to the meeting the pro-

posed contract between the Superior Oil Corporation and the Atlantic Refining Company for the sale and purchase of crude oil, which was read at length. At the conclusion of the reading he stated that the Atlantic Company was not particularly anxious to purchase the production of the properties outside of the state of Kentucky, and that, provided that so to do in any instance would not work to its own disadvantage, it would at any time be glad to waive its rights so to purchase under the terms of the contract, if the Superior Company deemed it advantageous to sell that oil elsewhere," and properly shows the real status of Atlantic toward this contract.

[7] The marketing of oil production, especially in fields remote from refiners, is the most serious problem confronting a producer. The building of pipe lines for transportation; the construction of tanks for storage; evaporation and leaking during storage; insurance; lightning strikage; the fact that his oil is a drug in times of low prices and his tanks are full, while his production still goes on—all these and many other factors make it very desirable for the producer to sell his product for a long term for he is a forced seller. On the other hand, all these elements become burdens to a refiner, who, when he makes such a contract, gives up his position as a free buyer for that of a bound buyer. It will be noted, also, that this 10-year contract which is alleged to have been fraudulently exacted by Atlantic, and which was annulled by the court's decree, embodied, save in years, nothing the two companies had not placed in their 5-year contract, when both companies were dealing independently and for their own interests; but even that 5-year contract was not the ordinary contract of buyers and sellers, but was exceptional, in that it was made by Superior to pay its debt and by Atlantic to secure its debt. And it will be noted, also, that the 10-year contract was provisional, that it was not to become operative until the $2,750,000 debt was paid, and that it was not made as an independent buyer and seller contract, without other consideration, but was an integral, dependent, and interwoven part of the financing and stock sale contract which was entered into on August 5th. It will also be noted that, as already stated, the 5-year contract already in existence might itself have extended long beyond its 5-year limit in case the $2,750,000 debt was not paid in toto. After a study of the proofs, and in light of the situation of the

contracting parties, we find no fraud was practiced by Atlantic on Superior in the making of such 10-year contract, and that Superior has shown no equity to a decree annulling it.

[8] This brings us to the alleged fraudulent conduct of E. J. Henry, an officer of Atlantic, who was a director on Superior's board. It will be noted that Mr. Henry did not occupy the position ordinarily held by a director. He was not placed on the board by the stockholders of Superior; they reposed no trust in him; he was not their representative; he was not empowered to manage Superior's affairs; he was placed there by Atlantic to safeguard its loan, and for no other purpose, and his status was defined in writing by Superior and Atlantic as follows: "That one share of stock held by Atlantic shall be issued in the name of the nominee of Atlantic, and that one director of said board of directors of Superior shall during the continuance of said loan be and remain a nominee of Atlantic, for the purpose of protecting said loan and its repayment with interest."

Of course, he was bound to act in good faith toward all parties in this dual position; but we can well understand that, so long as the internal affairs of Superior did not jeopardize Atlantic's loan, the standard of his duty was to co-operate with the directors of Superior, who were chosen by its stockholders. When Superior's directors, at a meeting of June 24th, entered into the 10-year contract, the minutes show Henry distinctly acted as Atlantic's representative, presented the offer, stated Atlantic's relation to it, and abstained from voting when the board accepted it. At the meeting of August 5th, when the final contract was adopted, Henry but followed the unanimous vote of Superior's directors and concurred in their action and wishes.

It is said, however, that on occasions Henry remained silent when the statement was made that Atlantic was paying $16 for its stock. This is sharply denied by Henry, and in that he is supported by the testimony of others, who united in saying no such statements were made in Henry's presence. But, assuming for present purposes such statements were made, and that Henry, who knew that Atlantic was only paying $8, remained silent, such silence is not necessarily fraudulent in purpose, for Henry might well have assumed that, as Superior had intrusted the financing plant to Catts, its president, as Catts was its sole representative in dealing

with the bankers and Atlantic, and as Catts had requested Atlantic not to disclose its price, we may as well attribute Henry's silence to his feeling he was complying with Superior's wishes, expressed by its president, about a sale at different prices, which was lawful, as to evidence a purpose to mislead and defraud.

In conclusion, we may add that, when the burdens and benefits accruing to Atlantic and Superior are summarized, especially in the light of after events, it would seem that there was equal, if not stronger, ground for stockholders of Atlantic criticizing their company's management for entering into these contracts than for Superior's blaming their management.

On the part of Atlantic, that company burdened itself by contracting to handle the entire product of Superior for 10 years; by contracting to buy and handle that product when oil was at low figures and a drug on the market, and in point of fact oil which was at a peak price of over $4 per barrel when the August, 1920, contract was made had fallen to somewhat over $2 just before this bill was filed; by assuming the whole management of Superior when it only owned one-third of its stock; by changing its position of creditor with assured periodic interest payments for that of stockholder with uncertain dividends; by tying up its stock for 2 years as that stock which others, during the tie-up period, sold for $16, and indeed as high as $20.75 had only a value of some $6 when the tie-up expired. On the other hand, by these contracts, Superior got the money to pay off all its indebtedness, enabled the bankers to sell its stock, and obtained working capital and funds to buy additional property.

In closing, I deem it proper to say that, after the thorough and protracted hearing of the case on argument, in view of the size of the record and the important issues involved, we were, of course, not prepared to discuss the case before the members of the court separated. Following our usual custom in such cases, the judges separated without any discussion of it whatever. When later we met for conference, each one of us, after a thorough and individual study of the record and briefs, reported his conclusions substantially as they are embodied in this opinion. I make this statement for the double purpose of acknowledging the helpful aid given me by the laborious conference memoranda of my associates, and because, in announcing this opinion, I feel the fact that each of us,

on a separate, independent study of the case, arrived at the same conclusion, greatly strengthens the joint opinion which is herewith rendered, which reverses the decree below and remands the record, with directions to dismiss the bill.