PENNEWILL, C. J., delivering the opinion of the Court: The defendant company was organized in July, 1925, for the purpose of taking over and refinancing two then existing public utility corporations formed under the laws of the State of Maine. The capital stock consists of both preferred and common shares, all without nominal or par value. In this case we are concerned with the common stock only, which is divided into 800, 000 shares of Class A common, and 400,000 shares of Class B common.
The complainants are holders of both class A and Class B common stock. The rights of the common stocks are as follows:
After the preferred dividends are provided for, the Class A common stock shall receive a dividend (noncumulative) at the rate of $1.50 per annum; then the common stock Class B is entitled to receive a like dividend of $1.50 per annum, and in case dividends are further declared from surplus or net profits Class A common and Class B common are entitled to share equally therein.
Upon liquidation, subject to the preference of the preferred stocks, Class A common is preferred over Class B common to the extent of $25 per share, then Class B common receives $25 per share, and thereafter any remaining assets are distributable between Classes A and B common in equal amounts.
When the corporation was formed it was anticipated that a large amount of money would be required to develop its business which was of a public utility character. It was concluded that the best way to do that was to use one class of its stock for the purpose, and make that class attractive to the investing public. The original sale of this stock was of a block of 120,000 shares to bankers who, the answer avers, and the affidavits show, were informed by the offering corporation that dividends would commence on said stock at the next dividend date fixed therefor at the rate of $1.50 per annum, and that the corporation would offer to the holders of said Class A common stock the right to subscribe to stock of the same class at $25 per share to the extent of the dividend. This right to subscribe is claimed to have had the effect of making the Class A common stock highly attractive to investors, so much so that the corporation has been able to receive for all of its Class A common stock originally and subsequently issued an average of nearly $42 per share and the market price of the stock has ranged between $50 and $64 per share.
The first dividend date was October 1, 1925. The holders of Class A common stock were advised that they might subscribe for stock of the same kind at $25 per share to the extent of their dividends.
Complainants were holders of Class A common stock and elected to exercise their option to use their dividends in payment for further stock at the price named in the letter.
On September 30, 1925, the officers of the corporation notified the bankers that in their opinion the policy adopted by the directors of allowing owners of common stock Class A to have the privilege of investing their regular dividends in additional Class A common stock at $25 per share was in the interest of the corporation and one that should be continued.
On November 4, 1925, the directors resolved to issue more of the Class A common stock, and to give to stockholders of all classes the right to subscribe therefor at $45 per share on the basis of 1 share for each 10 shares held at the close of business on November 20, 1925.
On November 11, 1925, an offer was made to all classes of stockholders in accordance with the resolution of November 4. About 48,000 shares were subscribed for in response to this offer and in due course issued.
The offering letter contained the two following paragraphs:
 "It is also the intention of the corporation to offer to the holders of its common stock, Class A, who shall be entitled to the dividend payable January 2, 1926, the right to subscribe to additional shares of common stock, Class A, to the amount of the dividends to which they are so entitled at the price of twenty-five (25) dollars per share.
 "The officers and directors of the corporation believe that this policy of offering the right to subscribe to the extent of the dividends of this stock should be continued, unless some change in business or financial conditions requires its modification or abandonment."
A resolution was adopted on December 4, 1925, by which a quarterly dividend of 37½ cents a share was declared on the Class A common stock payable on January 2, 1926, and stockholders were given the right to use their dividends in payment for additional shares of the same stock at $25 per share to the extent of their dividends.
In response to this offer something like 4,310 shares of common stock, Class A, were subscribed, but their issuance was restrained by order of the Chancellor upon the filing of the bill and pending a hearing on a rule for preliminary injunction.
On December 4, 1925, the book value of Class A common stock is admitted to be over $25 per share — how much over $25 per share is not stated. Class A common stock has been traded in, first on the New York Curb and since on the New York Stock Exchange. Its price since the incorporation of the defendant in July, 1925, down to January 18, 1926, as shown by market quotations, has ranged from a low of about $50 to a high of $64, and on the last-mentioned date was about § 58 per share. The current quotation is now shown to be about $48 per share.
As appears from the Chancellor's opinion, it was sought by complainants' bill to enjoin the corporation from carrying out its declared intention of allowing the holders of the Class. A common stock to receive additional shares of Class A common at the rate of $25 per share to the extent of their dividends; and generally to enjoin the defendant from issuing to the holders of its common stock, Class A, additional shares of such stock at less than the fair sales value thereof, unless there shall have been paid, or set apart for payment, to the holders of common stock B, during any calendar year, dividends at the rate of $1.50 per share per annum, and unless such additional shares are issued to holders of said common stock, Class B, upon the same terms as they are issued to the holders of common stock, Class A.
The rule to show cause why a preliminary injunction should not issue as prayed for in the bill of complaint was discharged by the Chancellor, and the restraining order theretofore issued was vacated.
It was from such decree of the Chancellor that the appeal before this Court was taken.
The defendant says that the granting or refusing to grant a preliminary injunction is a discretionary act which cannot be reviewed in this Court, but "believing that the fundamental question involved in this appeal is one of the greatest importance to those interested in the securities of Delaware corporations, and without direct precedent in this State or elsewhere, and further believing that there is before this Court on the record as it stands, all of the facts necessary for the final decision by this Court of the fundamental question here involved, we urge no reason why the matter should not be finally disposed of by this Court." The facts upon which the suit is based, and some of which we have stated, are not in dispute, and clearly appear from the record.
The complainants make no charge of fraud, bad faith or improper motive on the part of the directors of the defendant company in the issuance of the stock sought to be restrained.
The complainants contend:
 "That the policy adopted by the corporation has been carried on in such a way that the corporate right to issue additional common stock has been exercised in part for the exclusive benefit of the A stockholders, rather than equally for the Class A and Class B stockholders, and to the extent that it has been exercised for the exclusive benefit of the Class A stockholders it is unlawful and contrary to the rights of the Class B stockholders."
The defendant's plan was this:
 "By selling from time to time small quantities of a junior security, the common stock, Class A, the issuance of which involved no fixed charge against the corporation (because the dividends were not cumulative), to create a public demand for that same security at a price which would make the return to the corporation on large quantities of this common stock, Class A, to be marketed, average for the total amount so marketed a higher price distinctly remunerative to the corporation, and at which it would otherwise be impossible to sell the stock in the necessary wholesale blocks, either to the bankers or in the open market. In this manner it was believed to be possible to provide for all the financial needs of the corporation at low cost and without the creation of fixed charges."
In response to this offer, the holders of common stock, Class A, and among them the complainants, availed themselves of it to the extent of 2,003 shares.
The defendant says, the consideration the directors had in view for the issue of the relatively small amounts of stock to the holders of A stock at $25 a share was not only the amount paid per share by the holders of such stock, but the consequential stimulation of the public demand for the stock, which stimulation turned out to be worth some $17 per share, that is, the difference between the $25 maximum the stock would have brought without the subscription right and the $41.77 per share average actual return on all cash sales of the stock, so that the actual cash consideration received by the corporation for each share of all the shares of A stock that were sold for cash was not $25 but $41.77. That the offering in the public market of the 168,959 shares that were issued and sold for cash in five months would have driven the price far below $41.77 a share. That without the subscription right it would have been impossible to market this stock for more than $25 per share.
This contention is supported by the affidavits.
 The Certificate of Incorporation issued to the defendant contained the following provision in relation to the consideration for which all of its stock, without nominal or par value, might be issued:
 "The capital stock of the corporation, without nominal or par value, whether common or preferred, may be issued by the corporation from time to time for such consideration as may be fixed from time to time by the Board of Directors, and to such persons, firms and (or) corporations as the Board of Directors in its discretion may designate."
It is conceded by the complainants that a corporation can now sell additional capital stock to one class of stockholders to the exclusion of another, the pre-emptive right to subscribe having been waived under the Certificate of Incorporation, but it is claimed that to do so, the corporation must see that no monetary advantage accrues thereby to the chosen class, that is, that the stock is not sold below fair sales value.
We have endeavored to state in a general way the positions of the parties, but as the Chancellor says:
 "The controversy has solely to do with the right of the directors to issue no par common stock A to present holders of that stock, for the consideration of $25 per share to the extent of their dividends while at practically the same time they offer to sell and succeed in selling to all other classes of stockholders, or in the alternative to underwriting bankers, a much larger number of shares of the same kind of stock at $45 per share."
After all, that is the real and sole question in the case. The defendant, under its Certificate of Incorporation, had a right to sell the stock in question; did it have a right to sell it to Class A stockholders only at the price they paid?
[1] It is argued by the defendant that the power now given to a corporation in this State to sell no par value stock and fix the consideration therefor is broad and unlimited in its terms and should not be restrained in any case except for fraud. We are not required in this case to go so far, but we do say that the broad and general language of the statute, embodied in the Certificate of Incorporation, should be liberally construed in favor of the directors. The Legislature, in enacting the statute, meant to clothe the directors of a corporation with exceptionally large powers in the sale of its no par value stock. If in the particular case there is nothing to show that the directors did not exercise their discretion for what they believed to be the best interest of the corporation, certainly an honest mistake of business judgment should not be reviewable by the Court.
The defendant concedes:
 "That courts of equity have in cases of gross mismanagement on the part of a board of directors or a reckless disregard on their part of their duties to the corporation and its stockholders, acted for the protection of stockholders."
In the case of Hodgman v. Atlantic Refining Co., in the Circuit Court of Appeals, 13 F.(2d) 781, the Court said:
 "While an arbitrary sale of the same issue of stock at different prices to different persons would not be sanctioned, such differential sales will be sustained, if based on business and commercial facts which, in the exercise of fair business judgment, lead directors to follow such a course."
[2] It may be impossible to lay down a general rule on this subject, but we think the discretion of a board of directors in the sale of its no par value stock should not be interfered with, except for fraud, actual or constructive, such as improper motive or personal gain or arbitrary action or conscious disregard of the interests of the corporation and the rights of its stockholders.
[3] In the present case, the question is this:
 Was the issuance of the stock in question to Class A stockholders only, at $25 a share, illegal?
There is nothing in the evidence which indicates that the directors did not believe the policy they proposed to pursue would be for the best interest of the corporation and all of its stockholders. The evidence, which is necessarily opinion evidence for the most part, strongly supports such belief — there is nothing to the contrary. The fact that the directors had practically no common stock except Class B stock has significance in this connection. One director only had Class A common stock and that one 25 shares.
And the evidence also shows that the effect of the policy favored by the directors and opposed by the complainants, so far as carried out, was profitable to the corporation. It enabled the company to raise a large amount of money, which was required to develop the business, by selling large blocks of Class A stock at a fair price and at small expense without imposing any fixed charges on the corporation. All stockholders were permitted to buy the stock at that price, $45 per share, and thereby become Class A stockholders and qualified to participate in future benefits under the policy. The amount of shares sold originally to Class A stockholders was comparatively small, and it was done only to stimulate an interest in one stock, and thereby inaugurate the policy which according to the evidence was of great benefit to the corporation. The affidavits show that while Class A stock was worth much more on the market than $25 per share, at which it was sold to Class A stockholders only, it could not have been sold in the required large lots for more than that price. It is easy and reasonable to believe that this is true. The offering of large blocks of stock in the early history of the company would very likely have greatly depressed the market and resulted in a price not exceeding $25 per share.
The Chancellor found as a fact that it was the subscription privilege attached to Class A stock, together with the announced policy of the company that enabled the directors to sell enough stock at a fair price to meet the financial requirements of the corporation.
Basing our judgment on the evidence in the case, we reach the same conclusion as the Chancellor in regard to the beneficial effect of defendant's policy on the corporation.
The complainants, B stockholders, say that A stockholders have received for $25 per share, stock immediately resalable at $45 and there has been a conscious sale of A stock to the A stockholders at a price at least $20 per share below the sales value. Their position is that the practice complained of constitutes a conscious offer of no par value stock below its fair sales value, and like all such offers, is illegal; and even if a conscious offer of no par value stock below its fair sales value may be legal if made to certain persons, it is illegal if made to the A stockholders alone in addition to their quarterly cash dividends of 37½ cents per share and before the B stockholders have received $1.50 per share.
The complainants say the Chancellor agreed with the rule that a conscious offer of no par value stock below its fair sales value is illegal, and that both he and counsel for the defendant conceded that there was a conscious sale for less than fair sales value.
The Chancellor says in his opinion:
 "The mere showing of the two prices would without satisfactory explanation undoubtedly entitle the complainants to relief. But if these two prices are justified by a showing of fairness in the light of all the circumstances so that what appears to be an injury turns out tobe a benefit to those complaining, there can be no ground for interference. * * * It would be highly unreasonable to point to sales at $45 as showing the inadequacy of sales at $25 if the latter was what in fact made the former possible. * * * If, as a result of the policy thus grounded, the corporation is able to secure funds from stock sales greatly in excess of the amount they otherwise could hope to realize, it is manifest that an advantage has been secured for the corporation and for all its stockholders. The directors take the view as disclosed by the answer and affidavits that the announced policy has in fact yielded such advantage in an exceedingly large amount. They think that if it were not for the policy in question the block of 48,000 shares recently sold would not have ben marketed at much if any above $25 per share. It is of course a difficult matter to market a quantity of stock of that volume. * * * Such an offering would have caused the market in the stock to crash beneath its weight and in the end would have resulted in a sacrifice of the offered shares. Now in this situation it does not seem fair to say that the course the directors pursued did not result in securing a price substantially above, possibly $20 a share above, the price which but for such policy could otherwise have been obtained. It being a matter appropriately lying within the field of that discretion which directors are recognized to control, I do not feel disposed, in the absence of a showing of improper motive, to assume to interfere with it."
We have quoted at some length from the Chancellor's opinion because the quoted part is a very compact and succinct statement of the argument in favor of the policy proposed by the directors to raise the funds required for corporation purposes. It is impossible, of course, to tell to what extent the policy was successful, or whether a like stock sale privilege given to B stockholders might not have been effective, but judging from the affidavits filed, we cannot escape the belief that the plan pursued was very successful. Nor do we know what would have happened to the company if the policy complained of had not been adopted. It does clearly appear that the success of the company and the interests of all its stockholders depended upon the ability of the directors to raise a large amount of money at a low cost, and who can say that the plan adopted was not the best? Certainly no one can say the directors did not use their honest and best judgment in meeting a pressing emergency, and in solving a problem that meant much to the success of the corporation. It seems to us to be a case that comes clearly within the language and meaning of the statute which gives the directors a large discretion in selling no par value stock and fixing the consideration therefor.
Taking a broad view of the situation, we think the just and equal rights of Class B stockholders under the Certificate of Incorporation have not been infringed, and that the acts of the directors objected to were performed in good faith, in the exercise of their best judgment, and for what they believed to be the advantage of the corporation and all its stockholders.
There is one point made by the complainants in the lower Court that has not been considered, and need not be, because it was practically abandoned in this Court. Reference is here made to the contention that allowing Class A common stockholders to use dividends in buying other Class A stock at $25 a share amounted to a declaration of a dividend to them over and above the preference which the Certificate of Incorporation allows as against the Class B common. The argument is that to the extent of the amount the A stockholders could receive for the stock purchased, over and above the $25 a share they gave, they received a dividend in addition to the $1.50 a year which alone they were entitled to receive before the B stockholders were paid a dividend of $1.50 a year on their stock. As the Chancellor said:
 "The obvious answer to that contention is that while to be sure a profit can thus be made and the Class A stockholder obtain more than his dividend of $1.50 a year, the additional sum is not taken out of the earnings of the company. It is derived from the man to whom the stock is sold on the market."
The decree of the Chancellor will be affirmed.
 *Page 140