TILLIE KARASIK,

*vs.*

PACIFIC EASTERN CORPORATION, (formerly known as The Goldman Sachs Trading Corporation) a corporation organized and existing under the laws of the State of Delaware,

Defendant,

WALTER E. SACHS, ARTHUR SACHS, HOWARD J. SACHS, SAMUEL SACHS, HOWARD J. SACHS and NELLIE L. SACHS, Executors of the Estate of Harry Sachs, Deceased, SIDNEY J. WEINBERG, HENRY S. BOWERS, ERNEST D. LOVEMAN, RALPH JONAS, WADDILL CATCHINGS, GRANT KEEHN, SAMUEL W. ANDERSON and HAMILTON V. BAIL,

Intervenors - Defendants.

*New Castle, Aug.* 6, 1935.

*Harry Rubenstein,* and *Herman H. Oppenheimer,* of New York City, for complainant.

*Ivan Culbertson,* and *Whitney North Seymour,* of the firm of Simpson, Thacher & Bartlett, of New York City, for defendant, Pacific Eastern Corporation.

*Caleb S. Layton,* of the firm of Richards, Layton & Finger, and *Robert M. Benjamin,* of the firm of Parker,

Finley & Benjamin, *Samuel J. Silverman,* and *Walter Pollak,* all of New York City, for Walter E. Sachs, Arthur Sachs, Howard J. Sachs, Samuel Sachs, Howard J. Sachs and Nellie L. Sachs, Executors of the Estate of Harry Sachs, deceased, Sidney J. Weinberg, Henry S. Bowers and Ernest D. Loveman, intervening defendants.

*William Prickett,* and *Selig Edelman* and *Philip Levison,* both of New York City, for Ralph Jonas, intervening defendant.

THE CHANCELLOR: The court is indebted to the master for the thorough and painstaking manner in which he has studied the record in this cause and given symmetry to what, but for his report, would appear to one who approaches it with no previous intimacy, a mass of tangled detail. The master's report is of such character that the labor of the court in passing upon the exceptions is very much facilitated.

All the suits which the settlements propose to compromise involve the same subject matter. They are suits filed by stockholders of a Delaware corporation formerly known as The Goldman Sachs Trading Corporation and now known by the name of Pacific Eastern Corporation (herein called Pacific Eastern). The suits may be referred to as the "primary suits." The defendants in those suits are the officers and directors of Pacific Eastern, the members of a partnership called Goldman Sachs and Company, a firm of bankers and investment bankers which had a management contract with the corporation, and certain other individuals. The primary suits were filed by the complaining stockholders in their derivative right, and the bills asserted a ground of action for large damages in behalf of the defendant company. The gist of the complaint in each case was that the individual defendants and the partnership had so managed the assets of the corporation that the same were wilfully and recklessly squandered and wasted in the amount of many millions of dollars, for which an accounting to the corporation was prayed.

The suit in Delaware bears the abbreviated caption of *Cantor, et al., v. Sachs, et al.* It was before this court on a prior occasion when an opinion was filed touching an aspect of it not material to the pending bill. See 18 *Del. Ch.* 359, 162 *A.* 73.

While the primary suits were pending, negotiations for settlement were opened. On August 8, 1933, the defendants in the primary suits, all except Jonas, arrived at a basis of compromise with the directors of Pacific Eastern. Only one of the defendants, Walter Sachs, was a director when the settlements were negotiated. He took no part in them on the corporation's side. Jonas was left out of the settlement of August 8, 1933. He had before him the prospect of remaining the sole defendant. He felt aggrieved that he should have been thus abandoned and left to defend the suits alone, especially since he had had far less contact with the matters charged as grievances in the primary suits than his settling co-defendants had had. Jonas expressed his resentment. Certain remarks of Judge Hofstadter in one of the suits in the Supreme Court of New York fortified his feeling that his resentment was justified. Negotiations were opened with Jonas on about August 10, 1933. He made a final offer of settlement on August 24, 1933, solely, it appears, as a peace-buying proposition. On the next day, viz., August 25, 1933, the directors considered the Jonas offer and resolved upon its acceptance.

The offers of settlement were submitted to the stockholders of Pacific Eastern for approval or rejection. While there was no legal requirement that the stockholders should be called upon to express their desires in the matter, yet the directors, acting upon the advice of their attorney, deemed it best, under all the circumstances, that the stockholders should pronounce the final word of approval or disapproval. There were 5,765,081 shares of Pacific Eastern outstanding and entitled to vote. Of these shares 3,691,963 were present at the stockholders' meeting. Of the shares

which voted 3,041,517 voted in favor of the settlements and 10,178 voted in opposition thereto. Stock held by the defendants in the primary suits did not vote.

The compromises thus arrived at involve the granting of general releases to the defendants in the primary suits. The settlement reached with the defendants other than Jonas provides for the receipt by Pacific Eastern of one hundred thousand shares of its stock and eighty-five thousand dollars in cash, which allowing three dollars per share as the market value of the stock, makes the equivalent of three hundred and eighty-five thousand dollars. Of this amount Pacific Eastern would receive a net of not less than two hundred and ten thousand dollars, the balance going for costs and fees. From the Jonas settlement, Pacific Eastern will receive forty thousand dollars net. The total of net yield to Pacific Eastern, if the settlements go through, will therefore be two hundred and fifty thousand dollars. If book-value of the stock be the measure of its worth, the net to the corporation would be four hundred and fifty thousand dollars. The gross would be three hundred and eighty-five thousand dollars or five hundred and eighty-five thousand dollars, according as the stock is appraised at market value or book value.

It is these settlements in compromise of pending litigation which the pending bill seeks to enjoin.

The solicitors for the complainant take the view that the transfer to the corporation of one hundred thousand shares of its own stock yields nothing to the corporation. Both before the master and in their argument at the bar and on their briefs, they rather derided the suggestion that the corporation in receiving one hundred thousand shares of its own stock, gained anything. Their view is that all that the ownership of the shares results in is a reducing of outstanding capital liability. This, they say, gives the corporation nothing. They are plainly in error—so plainly so that if it were not for their tenacious insistence upon the contention, I would not deem it a point meriting an answer.

The answer is that the stock when acquired becomes treasury stock which may be sold by the corporation and realized upon as any other asset; or, if it is desired not to sell the stock, its retention by the corporation increases *pro tanto* the asset value underneath the stock held by the general body of the stockholders who are in a material though not technical sense the corporation, so to speak.

The bill attacks the settlements as fraudulent. It charges first that the amount of the claim for which a decree can be secured in any one of the primary suits is as much as one hundred million dollars, and that any settlement which yields to the corporation a net of only two hundred and fifty thousand dollars (or even four hundred and fifty thousand dollars) is so grossly inadequate as to be a fraud on dissenting stockholders. It charges next that the directors and dominant stockholders of Pacific Eastern in approving of the settlement were under the control and domination of the defendants in the primary suits or some of them. The answers deny that the settlement is an improvident one and deny that the action of the directors and stockholders of Pacific Eastern was in any wise induced or controlled by the defendants in the primary suits or any of them. The answers insist that under all the circumstances the settlements were in the best interests of the Pacific Eastern Corporation and that the directors and stockholders were actuated by good faith in approving of them.

That a great disparity in value between what a corporation receives in exchange for what it gives up, may be a *prima facie* badge of fraud on the dissenting minority was held in *Allied Chemical & Dye Corp. v. Steel & Tube Co. of America*, 14 *Del. Ch.* 1, 120 *A.* 486. This principle is relied on by the complainant here. If however, the disparity notwithstanding its magnitude is consistent with honesty of intent in accepting it, the appearance of fraud is removed. There is a presumption, rebuttable of course, that the directors of a corporation are actuated in their conduct of the business of the corporation by a *bona fide* regard for

the interests of the corporation. *Mercantile Trading Corp. v. Rosenbaum Grain Corp.*, 17 *Del. Ch.* 325, 154 *A.* 457; *Davis v. Louisville Gas & Electric Co.*, 16 *Del. Ch.* 157, 142 *A.* 654; *Finch v. Warrior Cement Corp.*, 16 *Del. Ch.* 44, 141 *A.* 54; *Robinson v. Pittsburgh Oil Refining Corp.*, 14 *Del. Ch.* 193, 126 *A.* 46. An honest mistake of business judgment on the part of directors is not reviewable by courts. This is the general rule and it it supported by the decision of the Supreme Court of this State in *Bodell v. General Gas & Electric Corp.*, 15 *Del. Ch.* 420, 140 *A.* 264.

The master found, after a careful and what appears to me to be an exceedingly intelligent review of the testimony and the arguments based thereon, that the decision of the directors and stockholders to accept the settlements was arrived at in the light of what seemed to them an adequately full investigation and in the exercise of their honest business judgment that the best interests of the corporation would be served by making the settlements. He has summarized his conclusions as follows:

"(1) The adverse interest in a director voting upon a corporate matter, which will vitiate the action of his corporation therein, is a direct adverse personal interest in the transaction itself and not an incidental or collateral personal interest, which may be subserved, or advantage, which may be gained, by reason of the effect of the contract or other transaction upon matters not directly connected therewith.

"(2) That, even taking as true the allegations in complainant's brief, the alleged 'dual positions and inconsistent relationships' of the directors of Pacific Eastern Corp., who voted to accept the proposed settlement, were not such as to create in them a legally recognizable 'adverse interest'; that the personal interests to be subserved and the personal advantages to be gained, if any, were purely incidental and collateral, 'wholly unconnected with the contract before the board,' and that the agreement of settlement, authorized by them, was not thereby rendered voidable.

"(3) That Guggenheimer's employment, as attorney for Pacific Eastern Corp. in the settlement, did not legally vitiate the settlement, nor cast any doubt on its *bona fides*.

"(4) That the value of the consideration to be received in settlemen was $385,000, (unless it be taken at 'asset value' $585,000.) and the probable realizable value of the assets of the firm and the individual members thereof, under judgments in the stockholders' suits, if and when obtained, would not exceed $2,000,000.

"(5) That in any contract for the sale of a corporation's assets, or similar transaction authorized by the directors, the inadequacy of the consideration to be received by the corporation may be so great, so 'gross,' as to be a 'badge of fraud,' that is to say, such *prima facie* evidence of fraud on the part of the directors or on the part of the other party to the contract, or of their reckless indifference to the rights of the corporation and its stockholders, as to prompt judicial investigation to ascertain whether, in fact, it was tainted by such actual fraud or authorized in such reckless indifference; that if the evidence adduced in such investigation convincingly prove the presence in the transaction of either of these invalidating elements, a court of equity may afford appropriate relief; that a 'badge of fraud,' in its legal meaning, is a 'sign or indicium of fraud,' but does not in itself *per se* constitute fraud nor is it conclusive evidence of fraud.

"(6) That the right of a stockholder to have any action of the directors of a corporation set aside is dependent upon proof that such action was *ultra vires* or fraudulent and seriously injurious to the corporation, or that the directors acted for their own interest in a manner destructive to the interests of the corporation or the other stockholders, or that a majority of the stockholders are appressively and illegally pursuing, in the name of the company, a course in violation of the rights of the other stockholders, which is restrainable by a court of equity.

"(7) That there is not in this settlement a 'gross inadequacy' of consideration; that the consideration is, in fact, adequate.

"(8) That, even if the consideration were found to be 'inadequate,' there is no proof of fraud on the part of the directors.

"(9) That the alleged 'mutual, material mistakes of fact, underlying the judgment of the directors in this matter (as to the value of the firm's assets and in not marshalling the unpledged assets and the unsecured liabilities in making their estimate of the amount of the firm's assets recoverable in judgments in the stockholders' suits) were neither mutual, nor material, nor mistakes and therefore cannot be held to vitiate the settlement.

"(10) That the agreement to give a general release to the members of the firm and to R. Jonas, was a matter resting in the sound

discretion of the directors and that their decision must be accepted, unless the giving of such a release was *ultra vires* of the corporation.

"(11) That, while the giving of a general release by a corporation is a matter to be carefully considered and to be capable of justification under all the circumstances, it is not *ultra vires* of the corporation or its directors.

"(12) That the contention of the complainant that the votes of certain directors were invalidated, because they based them on a belief of absence of merit in the stockholders' suits, which is contrary to the 'assumption' in this reference, is fallacious.

"(13) That, while the research and inquiry, into the merits in the stockholders' suits and into the financial condition of the firm and its individual members by the directors and their attorney, were not absolutely and completely exhaustive, they were sufficiently thorough to give the directors a sufficient knowledge to enable them to decide, with all due regard to the interests of the corporation, whether the settlement offered was properly acceptable.

"(14) That the directors exercised an 'informed, independent judgment' unaffected by the advice, opinions, requests or other sorts of influence given, made or exerted by anyone, other than their legal counsel.

"(15) That the settlement was not 'improvident' in any sense that justifies the interference of the court.

"(16) That, because of the membership of W. E. Sachs, one of the defendants to be released, in the board of directors of Pacific Eastern Corporation at the time the offer of settlement was accepted, the burden of proving that the transaction was fair and just to the corporation, with respect to the adequacy of the consideration, rests on him.

"(17) That the usual presumption against fraud, with respect to the alleged collusive agreement, exists in favor of the defendants and that the burden of proof thereof is on complainant.

"(18) That the evidence in the case * * * does not prove the existence of the alleged collusive agreement, but, on the contrary, satisfies me that there was, in fact, no such agreement.

"(19) That the 'assumption' of a recoverable judgment, for a very large amount, in the stockholders' suits was merely an hypothesis intended to raise the question of the adequacy of the consideration for the settlement and was created only for its procedural effect in defining the order of proof, and that the 'burden' thus placed on the

defendants, insofar as the alleged collusive agreement is concerned, was not the technical 'burden of proof,' but merely the 'burden of going forward with the evidence,' of which they were subsequently relieved by the Chancellor's direction to the complainant to 'go forward' with her proof.

"(20)   That where a compromise, settlement and release of any claim in litigation, actually and sincerely contested by the other party (especially when the claim is for unliquidated damages) is made by a corporation's directors, acting honestly, in *bona fides*, without fraud, without vitiation by reason of legally recognizable adverse interest of the directors, without reckless or careless indifference to the rights of the corporation or its stockholders, neither inadequacy of consideration, or mistake of judgment, nor mistake of fact (except 'mutual mistake' as recognized by the courts), will avail as a ground for its avoidance at the suit of a stockholder and that, in such case, the courts will not inquire into the merits of the controversy so settled, nor attempt to set up their own judgment as to the propriety of such settlement, its adequacy, or the validity of the judgment of the directors in acting thereon.

"(21) That the action of the stockholders, taken at the meeting of September 25-26, 1933, effectually established the validity of the agreement of settlement, if such establishment was necessary.

"(22) My further and final conclusion is that, the contract of settlement having been ratified by an overwhelming majority of the stockholders, all questions of inconsistent relationships of the directors and their counsel, disparity, improvidence and other alleged objectionable features have been completely answered and removed from further contention and that, no fraud having been found in the directors' consideration and acceptance of the offer of settlement and no collusive agreement between Atlas Corporation and the firm of Goldman, Sachs & Co. having been proven, but rather disproven, the action of the stockholders is final and conclusive. Wherefore, I recommend that the bill be dismissed as to all parties defendant, with costs on complainant."

The complainant has filed thirty-five exceptions to the report, which in substance amount to an exception to every one of the master's findings as above set out. One or two matters are excepted to by the complainant which are not apparent from the quoted findings and which will be presently noticed. The defendants excepted to the finding above designated as (16). It is unnecessary, however, to notice that exception, because as the recommendation that the bill

be dismissed will be accepted, the question raised by the sixteenth finding, so far as the excepting defendants are concerned, becomes moot.

In adopting the recommendation of the master, I conceive it to be unnecessary to review the evidence. To do so, would serve no useful purpose. It is sufficient for me to say that the master's treatment of the evidence and the views he has expressed upon the reasonable interpretation and legal effect thereof, on the whole appeal to me as sound. If at any point I should be in disagreement with the master, it would be with respect to matters which can have no effect upon the result.

There is one point in the line of the master's reasoning which the solicitors for the complainant assail with considerable vigor. Its attempted confutation is so forcefully presented that justice to the complainant's argument requires me to take notice of it. The point has to do with the disparity between the amount claimed in the primary suits and the amount yielded by the settlements. As before stated the amount claimed is one hundred million dollars and the amount received in settlement is a minimum of three hundred and eighty-five thousand dollars. Now that is a wide disparity. But it is one thing to assert a claim and another thing to prove the claim to judgment. Furthermore, it is one thing to obtain a judgment, and quite another thing to collect it. Figures, however imposing, should not compel practical considerations to yield place to visions.

When the cause was referred to the master, it was with the understanding (except as to Jonas) that for the momentary purposes of the reference, the merits of the claims in the primary suits should not be gone into. Of course whether those suits possessed merit to the extent claimed for them, was not only a material but it was a fundamental question in the pending suit, for if they lacked the probability of a decree in a large amount, there could be no controversy over the honesty of the settlements. Now to try the matters charged in the primary suits would involve

an exceedingly lengthy inquiry into some fifty or more transactions each of which would be the equivalent of a suit by itself. In order to avoid an extensive inquiry into those matters, an inquiry that would involve the expenditure of a great length of time and of much money by all the parties, it was determined agreeably to the wishes of both sides, that the hearing before the master should proceed on the assumption, for the time being, that the charges in the primary suits would, if any one of them proceeded, yield a decree for a very large sum of money, for as much, we will say, as the full amount of one hundred million dollars which was claimed. On that assumption, the master was then to proceed to inquire into the question of whether fraud could be found in settlements which yielded to the corporation only a gross for certain of three hundred and eighty-five thousand dollars.

Now in the course of that inquiry the defendants (except Jonas) took the position that even if a decree could be obtained in one of the primary suits in the large sum claimed, an amount could not be realized therefrom beyond the ability of the defendants to pay. Hence it became pertinent to inquire—how much could be realized from the assumed decree? This inquiry was directed primarily to the financial ability of the partnership of Goldman Sachs and Company and of its individual members. The directors engaged Mr. Guggenheimer, of the firm of Guggenheimer and Untermeyer of New York City, to examine and report to them upon this phase of the matter. Mr. Guggenheimer made such an examination and laid before the directors what he had found. His investigation was far from cursory. There is no reason in assailing it as unreliable. At all events it cannot be fairly said that the directors acted in bad faith in accepting and acting upon Mr. Guggenheimer's report. The evidence shows, as the master finds, that the available assets of the firm and its members, as of the settlement date, would not exceed two million dollars. There was a great amount of evidence before the master bearing on this

question of available assets of the firm and its partners. It was a subject of rather searching examination. I shall not review it. The master analyzed it in his report and reached the conclusion just stated. I am in accord with his finding.

Assuming then that the available assets as of the settlement date amounted to two million dollars, the question was whether the directors were justified in accepting from the owners of present assets in that amount, the minimum sum of three hundred and eighty-five thousand dollars, or the maximum possibly of five hundred and eighty-five thousand dollars, in gross settlement.

The action of the master in admitting evidence of facts which posited the problem before the directors in that manner, is vigorously not to say violently assailed by the solicitors for the complainant. In my judgment, however, the master was entirely correct in his views touching that aspect of the case. The chief complaint against his position in that regard appears to be that it is said to amount to a complete repudiation of an obtainable decree in the sum of one hundred million dollars, an assumption upon which the master was to proceed. The master did not repudiate the assumption. It was never assumed that one hundred million dollars would or could be collected on a decree in that amount. If that had been the assumption, there would have been no occasion to inquire further into the question of fraud. The solicitors for the complainant confuse a future judgment with its future collectibility. No judgment is worth more than it can be made to yield. Many men can be found, putting an extreme case, with whom it would be wise to settle for five hundred dollars a present judgment against them for five hundred thousand dollars.

And this, if it is not the more true is not the less so, when it is said with respect to a future judgment. The master so thought and I agree with him. He took into account the fact that the assumed judgment was *in futuro*, that the process of trial leading up to its rendition would

be long drawn out, that, because of the nature of the business of the partnership, the publicity of the trial might well destroy its worth and visit damaging financial consequences not alone upon itself but as well upon its members, and that, therefore, the present assets available to respond to a present decree might be very considerably reduced if not altogether lost when sometime in the future at the end of such a trial, a decree would be obtained. The directors took this view into consideration in forming their judgment. The master held they were justified in doing so, and I agree.

The assumed decree was not only one *in futuro*. It was also one *in posse*. While on the reference there was an assumption that a decree could be obtained, yet it is entirely unjustified to say that the directors and stockholders, when they passed upon the settlements, must have likewise assumed that a decree in a large amount could be obtained. It is not inconsistent with the present assumption that a decree could be obtained in one of the primary suits to say, that the directors when they made the settlement honestly believed that no decree could be obtained. They were advised by able attorneys that no decree in any of the primary suits was obtainable. In fact the solicitors who represented the complainants in the primary suits had, after considerable investigation, come to the conclusion that the charges made therein could not be successfully maintained. The directors knew that fact. Thus the advice of their own independent counsel was fortified by the opinions of the counsel who had represented the litigation from its inception and had spent much time in the endeavor to support it. The most that the assumption does is to pronounce for the moment that the attorneys' advice to the directors was mistaken, and that the opinions of the lawyers engaged in the primary litigation were also mistaken. The suggested mistake, however, if it was one, does not deprive the judgment of the directors formed long before the procedural assumption was made, of the quality of honesty and *bona*

*fides.* The directors, as a matter of fact, were of the opinion that the original suits were without substantial merit—an opinion which was based on competent legal advice. They regarded the suits as having a nuisance value only.

The master refused to receive evidence of the worth of Goldman Sachs and Company and of its individual partners as of the date of trial in contradistinction to the date of settlement. Objections to his rulings in this regard were noted and are now insisted upon. I am of the opinion that the rulings were correct. The situation is to be viewed as of the date the settlements were agreed upon. There is nothing in the opinion filed in *Vogtman v. Merchants' Mortgage & Credit Co., et al.,* recently decided by this court and reported in 178 *A.* 99, which militates against this view.

With respect to the Jonas settlement, the situation is different from that which prevails with respect to the settlement with his co-defendants, the Sachs group. When the reference to the master was made, Jonas refused to put in issue his ability to pay in case a decree was entered against him in any of the primary suits. In this respect the reference as to him differed from the reference as to the Sachs group. While the Sachs group undertook to justify the settlement with them in part upon their limited ability to pay any sum decreed against them in the primary suits, however large it might be, Jonas refused to offer any such justification. For the present, therefore, we must assume his ability to respond to a large judgment in case it might be eventually secured. The defense which Jonas made before the master was that there was no fraud or collusion entering into the settlement with him, and the master sustained him in that defense. Unless the merits of the grounds of complaint alleged in the primary suits are examined into and it is found after such examination that a liability would be decreed against Jonas, no question of the fairness of the settlement with him could possibly arise. The parties did not enter upon an examination of the merits of the primary

suits before the master. It must, therefore, be assumed against Jonas as against the others, that as a temporary procedural proposition a decree for a large sum would as a matter of fact be rendered against him in case the primary suits went forward through trial to a final determination. But that is far from saying, as before pointed out, that the directors and stockholders must be assumed to have known as a certainty that the case against Jonas was one that was bound to result in a decree favorable to the corporation if it was prosecuted to final hearing, and that if they acted contrary to that assumption it must have been because there was either express or legally presumed fraud. It is not to be forgotten that the directors and stockholders were dealing with a contested claim for damages. Even though the claim might eventuate after a long and expensive trial in a decree for the corporation, it is highly unreasonable to assert that if the directors and stockholders lacked the foresight accurately to see that result, but actually thought its opposite would emerge, they were guilty of such reckless disregard for the interests of the corporation that their judgment, however honest, ought, on a theory of presumptive fraud, to be disregarded by a reviewing court.

When it comes to the compromise of highly controverted disputes, the field is a peculiarly appropriate one for the exercise of the honest business discretion of a corporation's duly accredited managers. Mere mistake in the manner in which they honestly act in such matters does not justify judicial interference nor the substitution of a court's opinion for theirs. If it were not so, courts would be clogged with the pure business problems of corporations concerning which individual stockholders were in disagreement with the officers and directors chosen by the majority to think and decide for the corporate creature.

Of course if the error in judgment is contaminated by fraud, collusion or other vitiating circumstance, a case arises which calls for judicial correction. The master heard considerable testimony on the question of whether any sort

of vitiating circumstance corrupted the judgment of the directors and stockholders in the matter of the settlement with Jonas. He found no evidence whatever justifying the conclusion that any circumstance of that character existed. I agree entirely with his conclusion. The fact that we are for the moment assuming that there was a great disparity between what Jonas paid and the amount for which a decree could be rendered against him in the primary suits, is the only particular in which it can possibly be said that a circumstance appears which denounces the judgment of the directors and stockholders as *prima facie* fraudulent. But that circumstance loses all weight when it is remembered that in the mind of the settling directors it was non-existent. There is nothing on which to justify the belief that the directors were not wholly honest in that belief. The solicitors for the complainant sought diligently for some evidence by which they hoped to raise a reasonable suggestion that somewhere under the surface of the Jonas settlement there lurked the infection of some fraudulent influence. They failed utterly to discover it. So the master concluded. I accept his finding as fully justified.

Something is sought to be made of the fees which the corporation has agreed to pay to the lawyers who represented the complaining stockholders in the primary suits as though the size of those fees has something to do with what the settling defendants ought to pay. I agree with the master in the view that the amount paid by the corporation to the lawyers who brought suits in its behalf is a matter that is irrelevant to whether the defendants are paying to the corporation enough in settlement. The question of fees is one between the corporation and its attorneys. On that question this court has held that it will not review the action of directors in agreeing to pay an attorney's fee except for fraud. *Haas v. Sinaloa Exploration & Development Co.*, 17 *Del. Ch.* 334, 155 *A.* 4. The bill does not seek relief against the fees as fraudulently fixed.

The so-called "Culbertson-Hatch" episode which the solicitors appear to stress as of great significance, appears to me at the most to involve nothing more than an indiscretion. I can attribute nothing to it of any material significance as bearing on the important issue of fraud.

The master has recommended that the bill be dismissed. The recommendation will be approved. There is nothing in the unreported case of *R. H. McWilliams, Jr., Co., Inc., v. Missouri-Kansas Pipe Line Co., et al.*,[1] recently decided by this court and cited by the solicitors for the complainant,

---

[1] R. H. McWILLIAMS, JR., CO., INC.,
Complainant,

*vs.*

MISSOURI-KANSAS PIPE LINE COMPANY, a corporation, FRANK P. PARISH & CO., a corporation, KENTUCKY NATURAL GAS COMPANY, a corporation, and INDIANA-KENTUCKY NATURAL GAS CORPORATION, a corporation,
Respondents.

In the Matter of Petition of Receivers of Missouri-Kansas Pipe Line Company, for Approval of Agreement to Reorganization of PANHANDLE CORPORATION and PANHANDLE EASTERN PIPE LINE COMPANY.

Petition of Receivers of Missouri-Kansas Pipe Line Company for approval of an agreement relative to reorganization of Panhandle Corporation and Panhandle Eastern Pipe Line Company. Heard on petition, objections in the form of answers to the petition, oral testimony of witnesses before the Chancellor and exhibits.

*Christopher L. Ward, Jr.*, of the firm of Marvel, Morford, Ward and Logan, and *William H. Bennethum*, for receivers.

*John Biggs, Jr.*, of the firm of Biggs and Lynch, *Richard B. Hand*, of the firm of Gibbs, Hand and McCabe, of New York City, *Kenneth E. Walser*, of the firm of Spence, Hopkins and Walser, of New York City, of counsel, for New York Stockholders' Protective Committee.

*James M. Malloy* and *Gilbert F. Wagner*, of Chicago, Illinois, for certain objecting stockholders.

*Irving S. Herriott*, of the firm of Montgomery, Hart, Pritchard and Herriott, of Chicago, Illinois, for Chicago Stockholders' Protective Committee.

THE CHANCELLOR: If the proposed reorganizations are consummated, the receivers of Missouri-Kansas Pipe Line Company will emerge from the completed transactions with all their interest in

which would suggest a different result. In that case the Chancellor was called upon to say whether he would instruct receivers to join in a reorganization of Panhandle Eastern Pipe Line Company, stock in which was held by them as receivers of the Missouri-Kansas Pipe Line Company. The reorganization contemplated general releases from the receivers to certain corporations and individuals of a large alleged claim for damages asserted to be due to Missouri-Kansas Pipe Line Company under the federal anti-trust law. I declined to direct the receivers to join in the reorganization because I was unwilling to authorize the giving of the contemplated releases. In that case the Chancellor was acting as a substitute for the directors and was exercising his business judgment. In this case, the directors and stockholders have exercised their business judgment and the proposition before the court is, not whether they have acted wisely, but whether they have acted fraudulently. The

---

Panhandle Eastern Pipe Line Company wiped out, with all rights of action against the so-called Columbia group released, and in the possession of about three hundred thousand dollars in the form of cash or its equivalent. The question which the petition presents is whether this court should authorize the receivers to participate in a settlement of the affairs of Panhandle Corporation and Panhandle Eastern Pipe Line Company which leaves the estate of Missouri-Kansas Pipe Line Company in that condition. Missouri-Kansas stockholders invested about sixteen million dollars in the Panhandle Eastern pipe line. They will salvage nothing of that investment. Their creditors will receive as much probably as twenty-five cents on the dollar.

The objectors vigorously oppose the settlement. Their principal ground of opposition is directed against the granting of a release to the Columbia companies, their directors, officers and stockholders, whereby the releasees will be freed of all claims for damages which, it is claimed, Missouri-Kansas is now entitled to assert by reason of an alleged conspiracy on their part with others to destroy the Missouri-Kansas Pipe Line Company as a competitor in the business of supplying natural gas for industrial and domestic consumption in a considerable portion of the mid-western field. The receivers have heretofore received authority of this court to bring suits against the alleged conspirators. Such suits have been instituted, the damages laid running into many millions of dollars. Now, the receivers recommend to the court not only that those suits, so far as the Columbia group is concerned, should be .permanently abandoned but that also the Missouri-Kansas stockholders should lose all their

distinction between the two cases is so plain that it does not merit elaboration.

The record in this case is exceedingly lengthy. If I were to attempt a full review of it, the opinion would run to an inordinate length. The master has done that work and done it exceedingly well. I do not feel called upon to duplicate it.

The bill will be dismissed.

---

interest in the Panhandle Eastern pipe line enterprise. The receivers, and their counsel, I am confident, are sincerely of the opinion that the course they recommend is the most advisable one under all the circumstances. They have labored hard and industriously to rescue something from the wreckage of the insolvent company. In view of my respect for the judgment of the receivers, it is with reluctance that I find myself unable to act favorably upon their recommendation.

The record which is a very voluminous one and the briefs which are lengthy, are principally concerned with the merits or demerits as the case may be of the claims which the receivers have asserted against the Columbia group and which are proposed to be released. Concluding as I have that the receivers should stand aloof from the settlement, it is not in order for me, I conceive, to discuss the claims.

If I were to undertake to enter upon a consideration of those claims with the view of finally passing upon their validity, it would be for the purpose only of determining whether the claims should be prosecuted rather than released. The determination would not result in a decree or judgment. The trial of those grievances, if it goes on, will take place elsewhere. Inasmuch as mine is not the province to pronounce final judgment on the asserted causes of action, I feel it would be improper for me to embark upon a discussion of their respective merits with the view of announcing conclusions with respect thereto. Accordingly I refrain from saying anything which would appear to prejudice the position of those who assert the claims or of those against whom they are alleged. So far as this court is concerned, the matters involved in the pending or future suits, upon which the large claim for damages is based, are to be regarded as though the pending petition had never been filed. The conclusion that the receivers ought not to enter into the settlement is determinative of nothing except that as an administrative matter the terms of the proposed settlement do not appear to be such as to warrant the court's endorsement and consequent aid in accomplishing.

The prayer of the petition will therefore be denied without prejudice to the rights or claims of any of the appearing parties.

Let an order be prepared accordingly.