### SNEIDER v. TRANSCONTINENTAL & WESTERN AIR, Inc.

### Civil Action No. 1144.

District Court, D. Delaware.

Aug. 24, 1948.

340

Howard Duane, of Wilmington, Del., and Abraham L. Pomerantz and Leonard I. Schreiber, of Pomerantz, Levy, Schreiber & Haudek, all of New York City, for plaintiff.

Aaron Finger, of Richards, Layton & Finger, all of Wilmington, Del., and Gerald B. Brophy, Leonard P. Moore, and George A. Spater, of Chadbourne, Wallace Parke & Whiteside, all of New York City, for defendant.

LEAHY, District Judge.

Observations and Conclusions.

Plaintiff, on the basis of the pleadings and affidavits, urges the amendment modifying the agreement requiring Hughes Tool Company to take the stock at market value was fraudulent, because it results in an unjust benefit to Hughes at the expense of the remaining shareholders and because this is particularly bad, here, where the directors, who negotiated the agreement, were controlled by Hughes. Plaintiff claims if there is to be equity financing, it should be accomplished by offering new stock to all

of defendant's present stockholders at a substantial discount—or, "bargain rates"—rather than benefiting Hughes. Although he does not precisely say so, plaintiff, by necessary implication, admits ex the market value argreement equity financing to the public would be probable. This is a compulsive implication because defendant's broker affiants state when conditions permit equity financing, it would be much easier to secure with the Hughes "option agreement"[1] out of the way. Since these postulates are not exactly controverted, they are accepted as true and I assume equity financing may be arranged in the foreseeable future.

In opposition to the sought injunction, defendant urges that its board of directors, acting independently, concluded the amended agreement was for the best interest of all stockholders, was without fraud and was approved by the overwhelming majority of the non-Hughes TWA stockholders. Defendant also states, since it is the considered opinion of the directors, the stock might decline on account of the adverse affairs of TWA and thus it is the interest of all stockholders that this agreement be consummated by Hughes taking the stock at 10; otherwise Hughes might get many more shares of stock as the market falls below 10, and benefit accordingly if the stock should later rise.

So far as the record indicates, the purpose of the amended agreement was to eliminate uncertainty caused by the original option agreement in order to facilitate and make possible new financing. Although TWA's proxy statement does not say so, I assume the contemplated financing means equity financing, for the option agreement, and consequent uncertainty as to the future number of public offered shares would be irrelevant to creditor financing. Creditors are interested only in the amount of capital in $s and are not at all interested in the number or price of subordinated interests represented by common shares. Admittedly, Transcontinental & Western Air, Inc., is in need of financing. If it be proved at trial elimination of the option agreement will facilitate that financing, then I think

---

[1] I am not passing on whether this is truly an option agreement. The term is used merely as a convenient verbal designation for purposes of discussion.

that would be a sufficient justification for modifying the option agreement.

■■ At the time of the main argument for an injunction pendente lite, plaintiff's counsel categorically stated that with the book value of the stock at a large minus figure, equity financing was not only improbable but impossible in the foreseeable future. However, at the second argument on leave to allow plaintiff to file further affidavits and other writings, counsel for plaintiff conceded that equity financing was possible if the stock were offered to the stockholders at a substantial discount without the elimination of the option agreement. I do not think it pertinent whether the sought financing might be accomplished in a more beneficial manner to the stockholders. As long as equity financing is said to be possible and probable, the choice of means belongs to the directors and not to the courts on a motion for a preliminary injunction, especially where there has been overwhelming stockholder approval.[2] Further than that, even if the board is controlled, and I assume that it is, I do not see how that is material if there are possible alternatives prerequisite to equity financing, because on the record before me responsible financial affiants of defendant have stated that the choice adopted is more likely to make equity financing successful.

■ The relief which plaintiff seeks calls for one of the extraordinary equitable remedies. It is the rule of this circuit and district that an injunction pendente lite does not issue where parties are in serious dispute on conflicting questions of fact and law. Reynolds International Pen Co. v. Eversharp, D.C.Del., 63 F.Supp. 423, citing Warner Bros. Pictures v. Gittone, 3 Cir., 110 F. 2d 292; Murray Hill Restaurant v. Thirteen Twenty One Locust, 3 Cir., 98 F.2d 578; Hand v. Missouri-Kansas Pipe Line Co., D.C.Del., 54 F.Supp. 649; Oneida Community v. Fouke Fur Co., D.C.Del., 286 F. 757; General Talking Pictures v. Stanley Co., D.C.Del., 42 F.2d 904; Popular Mechanics v. Fawcett, D.C.Del., 1 F.Supp. 292; United States v. Weirton Steel Co., D.C. Del., 7 F.Supp. 255. If plaintiff is to prevail ultimately in a matter involving $10,000,000 and 1,000,000 shares of TWA, he is required —I am not saying he cannot—to gather more and vital proofs than to be found in the present paper record before me. I conclude the restraining order should be dissolved and the motion for injunction should be denied.

These observations are made on the findings which I take from the pleadings and the other papers so far filed. Here are the

### Findings

1. Plaintiff is a New York citizen. Defendant, Transcontinental & Western Air, Inc., is a Delaware corporation.

2. Plaintiff is the owner of 100 shares of common stock of defendant.

3. Plaintiff has been a stockholder of defendant prior to April 19, 1946 and was such at the time of the transactions complained of.

4. Hughes Tool Company owns 452,100 or approximately 45.85% of the outstanding shares of TWA.

5. By notice dated July 15, 1948, stockholders of TWA were advised of a special meeting to be held August 10, 1948 in Kansas City, Missouri, to consider (1). increasing the authorized common stock of TWA from 3,000,000 to 4,000,000 shares and (2). approving an offer by TWA to Hughes to issue 1,034,423 shares of TWA common stock to Hughes in exchange for $10,000,000 principal amount of Subordinated Convertible 2-3/4% Notes issued by TWA and all accrued interest thereon.

6. On August 3, 1948, plaintiff, here, brought suit on his behalf and on behalf of other stockholders of TWA, similarly situated, to enjoin defendant from taking any steps entering into agreements to convert the Subordinated Convertible 2¾%

[2] Orthodox statements on this phase of the business judgment rule may be found in Perrine v. Pennroad Corporation, Del.Ch., 47 A.2d 479, certiorari denied 329 U.S. 808, 67 S.Ct. 620, 91 L.Ed. 690; Allaun v. Consolidated Oil Co., 16 Del.Ch., 318, 147 A. 257; Atlantic Refining Co. v. Hodgman, 3 Cir., 13 F.2d 781; Bodell v. General Gas & Electric Corporation, 15 Del.Ch., 420, 140 A. 264. These authorities will not be applicable if, at trial, plaintiff adduces actual evidence of conspiracy and fraud by Hughes and TWA dominated directorate.

Notes in the principal amount of $10,000,-000 and accrued interest thereon issued by TWA and owned by Hughes, into 1,034,-423 shares of the common stock of TWA as proposed in a proxy statement sent by TWA to its stockholders.

7. Prior to June 15, 1948, TWA suffered large financial losses; it passed through several financial crises.

8. For instance, during 1946, new four-engine Lockheed Constellation Aircraft purchased by TWA were grounded by Government order until certain modifications were made. And in October 1946, all pilots of TWA were on strike for three weeks; no planes, as a result, were operated during this period. It followed, and because of rising cost levels, TWA lost $14,-347,836 during 1946.

9. 1946 losses wiped out TWA's earned surplus, its capital surplus, and impaired capital to the extent of some $700,000, thus leaving a capital of $4,203,886.

10. Book value of TWA's common, as a result of such adversities, reduced from $18.80 at the end of 1945 to $4.26 at the end of 1946.

11. During 1945–1946, TWA borrowed $40,000,000 from Equitable Life Assurance Society of the United States on condition it could not borrow more without Equitable's consent.

12. Then in January 1947, TWA needed other funds. The only source from which such could be raised, which must be subordinated to the Equitable loan, was Hughes, the holder, as stated, of the largest block of TWA common.

13. In 1947, Hughes lent $10,000,000 to TWA and TWA issued to Hughes its Subordinated Convertible 2¾% Notes due June 2, 1956 but convertible into TWA common at the election of Hughes, at any time prior to the Notes' maturity, at the average of the closing price of the common on the New York Stock Exchange on each of the last ten business days prior to the receipt of the notice of exercise of the right to convert, but at a price not less than the par value of $5 per share. This was subject, however, to TWA's right, at its option, to demand conversion at a price determined in a similar manner but only on January 1, 1950.

14. Losses in the air transport industry generally continued in 1947; and aggregate losses by major airlines approximated $26,000,000 of which TWA lost $8,079,761. Losses of 1947 absorbed TWA's remaining capital; they created a capital deficit of $3,192,822. This resulted in a minus book value per share of $3.23.

15. Ending 1947, TWA had to purchase new equipment. Twelve new Lockheed Constellations, representing a cost of some $16,000,000, could be financed by the manufacturers and participating banks only if Hughes subordinated its present $10,000,-000 loan.

16. On December 26, 1947, Hughes, in order to remove the impedimenta to the purchase of new equipment, agreed to forego payment of its Notes in cash, and agreed, in turn, by amendment to receive payment of its debt only through the conversion privileges embodied in the Notes. On March 25, 1948 this amendment to the original loan agreement of $10,000,000 was confirmed by Hughes, the manufacturers, and the participating banks and further agreement to this end was consummated by the contracting parties.

17. On May 28, 1948, TWA had to make payment of interest and amortization on its Equitable loan of about $1,100,000 which it could not make and still have the current cash necessary to carry on its operations. So advised, the Civil Aeronautics Board granted a temporary mail rate increase, it finding that "Due to the critical financial condition of TWA it will be in the public interest to increase its temporary mail rates for the period after December 31, 1947." Yet even with such increase, TWA lost $4,420,220 during the first five months of 1948.

18. During the first of June 1948, a forecast of TWA's finances for 1948—also the first six months of 1949—was submitted by TWA's Vice President and Treasurer to the Finance Committee of the Board of Directors, to the banks and insurance company which had lent money to TWA. This forecast made a guess that TWA will have exhausted its cash within less than

nine months and that a resulting loss of $1,897,000 was estimated for the first six months of 1949.

19. Prior to June 15, 1948, the critical date of the agreement in suit, TWA made inquiries from the investment banking houses of Kuhn, Loeb & Co., Smith, Barney & Co., Merrill Lynch, Pierce, Fenner & Beane and Dillon, Read & Company, concerning further possible financing of TWA.

20. Opinions given to TWA by the banking houses were: 1. TWA required equity financing; 2. it would be difficult, if not impossible, to accomplish a public offering of common or any other type of equity security with the Subordinated Convertible 2¾% Notes remaining outstanding.

21. Market history shows during the years from 1937 to date, TWA's common has sold under $5 per share in two of these years, and less than $10 per share in five of these years.

22. To remove the Notes as impedimenta to equity financing, Hughes was requested to state the terms on which it would be willing presently to convert the Notes in order to find new financing.

23. At a meeting of the TWA Board on June 15, 1948, a statement was read on behalf of Hughes, outlining the terms on which immediate conversion of the Notes might be effected. Eight directors of TWA were present. These men were: John A. Collings[3]; A. B. Eisenhower[4]; Oscar F. Holcombe[5]; A. V. Leslie[6]; Sidney Maestre[7]; Warren Lee Pierson[8]; A. D. Simpson[9]; and Nelson S. Talbott.[10] None of these directors was an officer, director, employee or stockholder of Hughes Tool Company.

24. After discussion, TWA directors present instead of accepting the proposal of Hughes, made a counter-proposal and suggested a conversion at a fixed price of $10 per share provided the counter-proposal was accepted by Hughes not later than June 18, 1948, and subject to approval by the holders of a majority of the common stock of TWA, exclusive of stock owned by Hughes, present in person or represented by proxy at a special meeting of TWA's stockholders, and subject to obtaining the consents of the lending banks and other institutions whose consents were deemed necessary or advisable.

25. The offer to convert the stock at a fixed price of $10 per share was accepted by Hughes on June 18, 1948, subject to the stated conditions.

26. As of June 15, 1948, the average of the prices at which the last sales of TWA's stock were made on each of the last ten business days preceding June 15, 1948, was $16.25 a share.

27. On August 10, 1948, at a special meeting of the stockholders of TWA to vote upon the proposal for conversion, 754,768 shares of common stock were present in person or by proxy out of a total of 986,063 shares of such stock issued and outstanding. 723,237 shares voted in favor of the adoption of the resolution confirming and approving the offer for conversion made by TWA and accepted by Hughes for the conversion of the Subordinated Convertible 2¾% Notes in the aggregate principal amount of $10,00,000, plus all accumulated interest thereon into 1,034,423 shares of TWA's common stock. 29,443 shares voted against the adoption of the resolution.

28. 302,668 shares held by stockholders other than Hughes were present, in person or represented by proxy, at the special meeting of stockholders. Of these 302,668 shares, 271,137 shares voted in favor of the resolution or 89.6%

29. In order to be ready to obtain the necessary financing to carry on the opera-

---

[3] Vice President in Charge of Operations of TWA.

[4] Executive Vice President of the Commerce Trust Co. of Kansas City.

[5] Mayor of Houston, Texas.

[6] Vice President and Treasurer of TWA.

[7] President of Mississippi Valley Trust Company of St. Louis, Missouri.

[8] Chairman of the Board of TWA.

[9] President of the National Bank of Commerce of Houston, Texas.

[10] President of Talbott Corporation of Dayton, Ohio.

tions of TWA if the conversion proposal were approved, TWA has retained Haskins & Sells, public accountants, to conduct an audit of the company's books for the purpose of filing a registration statement with the Securities and Exchange Commission. TWA has also instructed counsel to commence the preparation of a registration statement.

30. There is no provision in the Notes or in any of the agreements relating to the Notes that requires Hughes Tool Company to convert the Notes held by it at any specific time during the period expiring on June 2, 1956, with the exception of the one day option given to TWA on January 1, 1950.

31. There is no proof as to what the market price of TWA stock will be for the ten days prior to January 1, 1950, or that the Board of Directors of TWA have any knowledge of such price.

32. There is no proof that it will be in the best interest of TWA to exercise its option to require conversion on January 1, 1950.

33. If the market price of TWA stock should be $5 per share or less at a time when Hughes Tool Company should exercise its right of conversion, TWA would have to issue two million shares of its common stock to Hughes Tool Company in satisfaction of the principal amount of the Notes aggregating $10,000,000 plus such additional shares as may be necessary to satisfy interest payments accruing at the rate of $275,000 per annum since the issuance of the Notes.

34. There is nothing in the present record to show that the directors of TWA were not acting in the best interests of the company to avoid the necessity of issuing a larger number of shares than the number proposed in the offer of June 15, 1948 in the event that Hughes Tool Company at some future time might elect to exercise its conversion rights at a time when the stock might be selling at less than $10 per share.

An order in accordance with the foregoing may be submitted.