JAMES J. DUANE, JR. and MARGARET W. DUANE, doing business under the firm name and style of JAMES J. DUANE & Co., THOMAS B. HAND, GINO TREVES and PETER G. TREVES, suing individually as stockholders of SERVEL, INC., on behalf of themselves and all other stockholders of Servel, Inc. similarly situated and in the right of SERVEL, INC.,

Plaintiffs,

*vs.*

DUNCAN C. MENZIES, J. PATRICK LANNAN, HUNTER S. MARSTON, H. IRVING PRATT, W. F. ROCKWELL, JR., LOUIS RUTHENBERG, A. LIGHTFOOT WALKER, ROBERT E. WALKER, JOHN H. WALL, and SERVEL, INC., a Delaware corporation,
Defendants.

*New Castle—July 22, 1958.*

*Irving Morris,* Wilmington, *Milton S. Gould* of Gallop, Climenko & Gould, and *Benedict Wolf* of Wolf, Popper, Ross, Wolf & Jones, New York City, for plaintiffs.

*William E. Taylor, Jr.,* Wilmington, and *Norman S. Nemser,* New York City, for Samuel Achsel, an objecting stockholder.

*Aaron Finger,* Wilmington, and *William T. Caldwell* of Brown, Wood, Fuller, Caldwell & Ivy, New York City, for defendant, Servel, Inc.

*William Poole,* Wilmington, and Sullivan & Cromwell, New York City, for defendants, Duncan C. Menzies and John H. Wall.

MARVEL, Vice Chancellor: The parties to this litigation as of the time of the filing of the amended complaint seek Court approval under *Rule* 23(c), *Del.C.Ann.,* of a proposed settlement and compromise of a derivative stockholders' suit brought for the benefit of Servel, Inc. Revised agreements entered into between the corporate defendant and the defendants, Menzies and Wall, submitted as the basis for dismissal of the present action were attacked at the settlement hearing by an attorney for Sam Achsel, an alleged stockholder, on the grounds that a true compromise of pending litigation is not before the Court but rather an application on plaintiffs' part to discontinue their action with prejudice. The objectant seeks leave to intervene and to litigate the issues raised in plaintiffs' amended complaint.

The corporate defendant began operations about 1930, engaging principally in the manufacture of gas-operated household refrigerators. Following World War II, during which Servel diverted its efforts to war work, the corporation was faced with damaging competition in the refrigeration field, and after the Korean War, during which war production work was again principally engaged in, Servel's civilian business resumed a downward trend despite attempts in allied fields such as air conditioning and the manufacture of freezers. By 1954 the corporation's affairs were in desperate straits, and Mr. Menzies, who had established an enviable reputation for improving industrial operations, was accordingly hired and elected a director and president of the corporation.

The complaint, as amended, alleges that in addition to being compensated by salaries, pension plans and an option plan, certain officers and/or directors of Servel, Inc., including Mr. Menzies, were for the fiscal years ending October 31, 1955, 1956 and 1957, the beneficiaries of so-called "percentage compensation" agreements under which through a crediting to them of a percentage "of the improvement in operating results" of Servel's two basic business divisions,

namely civilian and defense production, they became entitled to receive on a deferred basis a total of $790,434 [1] of which the corporate president Mr. Menzies, is presently entitled to a credit of $664,850. It is further alleged in the amended complaint that during this same period the corporation reported decreases in net sales as follows, from $87,067,-080 in 1954 to $58,614,034 in 1955, to $42,665,371 in 1956 and finally, $16,623,346 in 1957. From 1954 through 1957 net civilian business losses allegedly were reduced as follows for each such year, $8,907,766, $4,027,292, $1,833,217 and $186,864. The paradox in the controversial percentage compensation provision of the employment contracts is that being based on "improvement in operating results" before taxes, it has been applied by the corporate officials in charge of the corporate defendant's affairs so as to cause substantial sums to be credited to beneficiaries of such provisions, particularly Mr. Menzies, during a period in which "improvement" resulted not from increased business activity but rather from a gradual reduction of operations culminating in a sale of all assets and a consequent elimination of what had been tremendous civilian division losses. See *Treves v. Menzies, ante p.* 330, 142 *A.2d* 520.

The amended complaint prayed for an order declaring the defendant directors liable for damages allegedly caused the corporation in having it assume the obligation of paying certain corporate officers "percentage compensation" on the basis of "improvement in operations" during a period when according to plaintiffs, there was no improvement in operations and ultimately no operations. Plaintiffs further sought the enjoining of such payments and the recovery of any moneys already paid out under such agreements. Similar relief was sought as to an option plan designed to benefit Mr. Menzies and other corporate officers and directors including certain of the individual defendants. Demand on the board is excused on the grounds that "* * * the individual defendants have a vested interest in the said obligations."

1. Computed by independent public accountants on the basis of a civilian division loss for the fiscal year ending October 31, 1954 of $8,648,000 and a defense production division gain for the same period of approximately $4,875,000.

Turning to the Menzies agreement[2] of September 15, 1954 which is the principal bone of contention in the percentage compensation issue raised in the complaints, it appears from the Servel letter to stockholders preceding the February 24, 1955 annual meeting (Servel Ex. 2(a)) that such agreement was presented for stockholder approval on the basis of its promise of corporate rehabilitation. The letter stated:

> "When new management is brought into a corporation to rehabilitate it, and succeeds in so doing, it is fitting that compensation be largely contingent upon the improvement to be actually accomplished. The Agreement with Mr. Menzies follows this pattern."

The letter goes on to say after setting forth the essence of the percentage payment and option provisions of the Menzies' contract:

> "In order for Mr. Menzies to receive anything under the arrangements referred to in (1) of the preceding sentence, there must be such an improvement in one or more years in the operating results of one or both Divisions over the results of the fiscal year ended October 31, 1954 that 5% of such improvement exceeds Mr. Menzies salary * * *

> "From the foregoing, you will, of course, realize that out of every $1 of improvements in operating results in either Division (the loss of a Division in one year does not reduce the results of that Division in any subsequent year or the results of the other Division in the same year) during the five year period of full time

---

2. Such Agreement provided for a salary of $75,000 per annum over a five year period plus 5% "* * * of the amount (if any) by which the 'adjusted consolidated operating results' (hereinafter defined) of each * * *" of the two basic divisions "* * * for each such Percentage Year (it being understood that the losses of a Division in one year will not reduce such net results of that Division in the next or any subsequent year) exceeds or is better than the adjusted consolidated net operating results of the same Division for the fiscal year ending October 31, 1954 (hereinafter called the 'Base Year'), which aggregate sum, less $75,000 or the portion thereof payable in each such fiscal year ending in 1955 through 1959, respectively, under (a) above, will be paid to Mr. Menzies as provided in paragraph 5 below."

employment of Mr. Menzies over the operating results of tha' Division for the fiscal year 1954, 95¢ (before income taxes) will accrue to the benefit of Servel (including, of course, its stockholders) and only the remaining 5¢ is contingently payable to Mr. Menzies."

Not only was the agreement approved[3] by the stockholders but the amounts paid out under its terms were thereafter annually reported to them through the fiscal year 1957. Significantly, two stockholders appeared at the adjourned hearing on the proposed settlement and testified that in their opinion Mr. Menzies had done an outstanding job and had fully earned whatever sums he was entitled to receive from Servel. In their opinion as in the opinion of the board of directors Mr. Menzies has skillfully negotiated favorable sales of Servel's assets, saving the corporation substantial finders' fees and opening the way to the acquisition of a new type of business, which it is hoped, will earn a return for the stockholders. They are not concerned with legal aspects of dealings between Mr. Menzies and others on the board.

Specific sections of the original Menzies agreement (Achsel Ex. 1) read as follows, page 3:

"For the purpose of such computation (results of operations), the aggregate 'adjusted consolidated operating net results' of a Percentage year will be the consolidated net profit or loss, as the case may be, before federal and state income taxes and before deduction of amounts payable under this subparagraph (b) * * *" (the formula for percentage compensation) adjusted to exclude extraordinary income and expense items thereafter outlined.[4] Paragraph 8 of the agreement states: "Servel warrants and represents that it is not considering any offer to merge with or into any other company, to sell or exchange

---

3. Approval was voted by more than the 75% of stock present as stipulated by the agreement, a vote consisting of 60% of the stock outstanding and entitled to vote. If stockholder aproval had not been obtained, either party could have terminated the contract within thirty days following the meeting.

4. Par. 6 of listed exclusion reads: "Profit or loss on sale or abandonment of fixed assets in excess of $25,000 in any year."

any substantial portion of its assets or to discontinue any substantial portion of its business * * *", however, paragraph 10 provides that the formula will apply notwithstanding a merger or a transfer of all or substantially all of Servel's assets.

While it may well be that Mr. Menzies is lawfully entitled to the high compensation credited to him on the basis of his contract through the fiscal year 1957, despite the turnabout in corporate plans, nonetheless it became apparent to Servel's other directors as early as the autumn of 1956, when a part of Servel's assets was sold, that application of the formula for determining percentage compensation to years during which there would be little or no production was at odds with the formula's original purpose. Accordingly, at the end of March, 1958, the Menzies' agreement was modified after negotiations between Mr. Menzies and the other directors which changes were summarized as follows in the June 3, 1958 notice mailed to stockholders pursuant to this Court's order.

"(i) Mr. Menzies' period of full time employment is extended from September 15, 1959 through October 31, 1961, provided however, that (1) Servel has the right on or before June 15, 1958 to terminate the period of full time employment as of June 15, 1958, (2) Servel and Mr. Menzies each has the right for 30 days after December 31, 1958 to terminate the period of full time employment as of January 31, 1959, if on or before December 31, 1958 Servel shall not have acquired, or contracted to acquire, a new business, and (3) if prior to December 31, 1958 Servel shall have acquired, or contracted to acquire, a new business, Mr. Menzies shall have the right for 30 days thereafter to terminate the period of full time employment as of the end of such 30 days' period. If the period of full time employment is terminated under the provisions referred to in clause (1) or (2) above, the requirement that Mr. Menzies, in order to receive payment of his Percentage Compensation, shall not, without the consent of Servel, be paid or employed by, or have a substantial equity ownership in, any competitor of Servel shall become and be inoperative.

"(ii) Mr. Menzies' Percentage Compensation for the period after October 31, 1957 shall be 5% of the *net income,* before income taxes of Servel for each fiscal year beginning with November 1, 1957. If the period of full time employment is terminated under the provisions referred to in clause (1) or (2) of paragraph (i) above, Mr. Menzies will not receive any Percentage Compensation in respect of any fiscal year after the fiscal year ended October 31, 1957". (Emphasis supplied.)

At the same time the price for 150,000 shares of common stock of Servel under the option issued to Mr. Menzies in February 1955, was reduced from $7.625 per share to $4.875, and was made unexercisable until the date a new business was acquired or February 1, 1959, whichever is earlier.

The stockholders were told in the settlement notice that assuming the corporation sustained no loss in either the fiscal year 1958 or 1959 the elimination of the 5% compensation payment to Mr. Menzies as set up in the original agreement would result in a corporate saving of $714,800 for those years. In addition, it was pointed out that, subject to termination rights, Mr. Menzies full time employment had been extended for two years, that is to say from September 15, 1959 through October 31, 1961, but that if a new business has not been acquired by December 31, 1958, Mr. Menzies' employment, notwithstanding the terms of his original contract, may be terminated without liability to the corporation. An additional right acquired by the corporation to terminate Mr. Menzies' employment, as of June 14, 1958 has, of course, lapsed. It was also pointed out to the stockholders that the reduction in the option price of the stock which Mr. Menzies is entitled to receive under his option agreement in addition to being an inducement for him to give up his percentage compensation rights is tied in with the effort to obtain a new business, being in effect terminable if Mr. Menzies fails in this effort during 1958.

Admittedly, Mr. Menzies and Mr. Wall,[5] who is also a defendant and was employed under a percentage compensation contract for the

5. A similar modification of Mr. Wall's percentage compensation contract was made, effective October 31, 1957.

years in question, have made concessions, but there has not been any agreement furnished to the corporation to restore [6] percentage compensation moneys for the fiscal years 1955, 1956 and 1957. If the accepted method of applying the percentage compensation formula was clearly at odds with business realities for the fiscal year, 1958, was it properly applied for other years? Furthermore, should the undertakings of Messrs. Menzies and Wall serve to protect others, who having left Servel's employ, are presently receiving percentage payments on a periodic basis?

Finally, is there any real connection between the negotiations carried on by Mr. Menzies and by Mr. Wall with others on the board concerning the amendment of their employment contracts prospectively from October 31, 1957 and plaintiffs' action insofar as it attacks the legality of past payments to such persons and others?

While admittedly this Court should not substitute its business judgment for that of independent directors, particularly in the field of compromise of litigation, *Karasik v. Pacific Eastern Corporation*, 21 *Del.Ch.* 81, 180 *A.* 604, the compromise here was the product of negotiations which plaintiffs at the most merely stimulated, and the amended [7] agreements will remain in force regardless of this Court's ruling on the proposed dismissal of plaintiffs' action. In short, I do not think that a stockholder who is reasonably dissatisfied with the proposed dismissal should with all other stockholders be forever barred from litigating essentials of the case pleaded by plaintiffs merely because plaintiffs desire to settle all phases of their claim on the basis of effective amended agreements which the corporation has worked out with the defendants, Menzies and Wall.

---

6. The fact that the amount sought to be recovered by plaintiffs for past payments, namely $790,434, approximates the amounts of conjectured future savings, namely $714,800 as a result of the Menzies' amended agreement to which must be added possible savings of $70,000 on the Wall's amended agreement is purely fortuitous.

7. Objection to the compensation agreement was made by an attorney for plaintiffs at the annual stockholders' meeting on February 27, 1958. Suit was filed in Delaware on April 10, 1958.

The *Rule* 23(c) procedure for a hearing on dismissal of a class action throws a heavy burden [8] on the Court particularly when objection is forcibly made. In my opinion the objection made here cannot be disposed of on the meagre record before me in what has been to date a summary proceeding. I am unwilling to approve the unusual settlement here presented or to grant attorneys' fees to plaintiffs pending a fuller development of the facts and circumstances surrounding the entering into of the percentage compensation agreements, the granting of options and the other forms of compensation attacked in the original and amended complaints as well as the facts and circumstances surrounding revisions of such corporate undertakings following the development of director and stockholder concern. In due course I shall also expect further briefing on the legal and accounting principles governing interpretation and operation of the type of percentage compensation agreements here involved. See *Chap. 3, Compensating the Corporate Executive, Rev.Ed.* by Washington and Rothschild; *Roger v. Hill,* 289 *U.S.* 582, 53 *S.Ct.* 731, 77 *L.Ed.* 1385, and *Winkelman v. General Motors Corp., D.C.S.D.N.Y.,* 44 *F.Supp.* 960.

---

8. See article on Capacity Of Plaintiff-Stockholders To Terminate A Stockholder Suit, 46 *Yale Law Journal,* 421.